KATZMANN, *Chief Judge*, concurring in part and dissenting in part:

It is well known that immigrants in this country "have no specific right to counsel" in immigration proceedings, even for life-altering proceedings such as detention and removal. *Aris v. Mukasey*, 517 F.3d 595, 600 (2d Cir. 2008) (internal quotation marks omitted). What is less well known, but no less consequential, is that *U.S. citizens* also have no such right if they are ensnared in our nation's detention and removal system, and yet they bear the burden of establishing their citizenship in order to secure release. This case is a striking illustration of the consequences that stem from the government's broad discretion to initiate detention and removal proceedings, coupled with the sometimes limited ability even a U.S. citizen has to assert a valid claim of citizenship in the absence of the assistance of counsel.

While I join the majority's disposition of Watson's malicious prosecution and negligence claims, I do not join the other aspects of the decision, for two principal reasons. First, I do not share the majority's confidence that, for the purposes of Watson's false imprisonment claim, "Watson was certainly held pursuant to [legal] process" by no later than November 13, 2008. Maj. Op. at 11. Second, I do not find that, after a thorough bench trial and detailed findings of fact, the district court abused its direction in concluding that equitable tolling was warranted. I cannot agree with the inference that the conditions surrounding Watson's wholly unjustified 1,273-day detention were an "entirely common state of affairs." Maj. Op. at 22 (quoting *Wallace v. Kato*, 549 U.S. 384, 396 (2007)). To the best of my knowledge, this is the first time this Circuit has *ever* reversed a district court's decision to grant equitable tolling in such a fashion, and I simply do not think such a reversal is warranted in light of the circumstances of Watson's detention. For the reasons that follow, I respectfully dissent as to these issues.

## I. The Government's Negligent Detention of Watson

Prior to acknowledging in a "revised memorandum" in November 2011 what the government should have recognized from the start — that Watson has

1

been a U.S. citizen since 2002 — the government had detained Watson for 1,273 days. *Watson v. United States*, 133 F. Supp. 3d 502, 518 (E.D.N.Y. 2015) [hereinafter *Watson I*]. I do not share the majority's view that the government's mistake "resulted in part from the fact that Watson's father (Hopeton Ulando Watson) and his mother (Dorrette McFarlane) never married," Maj. Op. at 4, because regardless of his parent's marital status, Watson's derivative citizenship claim, if properly investigated, would have been easily verified. Instead, as the district court explained in its post-trial findings, Watson's "wrongful" detention resulted from the government's "negligent failure to properly investigate plaintiff[']s claim of citizenship" and from the "grossly negligent" "[r]epeated and routine approval of the initial investigation by public officials without checking the facts." *Watson v. United States*, No. 14-CV-6459, 2015 WL 7281637, at *1 (E.D.N.Y. Nov. 16, 2015) [hereinafter *Watson II*]. These errors, which occurred prior to Watson's detention, were then compounded during Watson's removal proceedings by the misapplication of relevant case law by government lawyers, the immigration judge ("IJ"), and even the BIA, which was only brought to light once Watson's case finally reached our Court and we assigned him pro bono counsel. I thus share the trial court's cogent view that "[i]f plaintiff had counsel upon his initial detention, it is likely that he would promptly have been found to be a United States citizen and released." *Watson v. United States*, No. 14-CV-6459, 2015 WL 7281638, at *1 (E.D.N.Y. Nov. 17, 2015) [hereinafter *Watson III*].

It is worth reflecting on the "grossly negligent" government actions that led to Watson's three-and-a-half-year detention. *Watson II*, 2015 WL 7281637, at *1. Early in ICE Deportation Officer Erik Andren's investigation into Watson's citizenship status and eligibility for removal, Andren interviewed Watson "at New York's Downstate Correctional Facility where plaintiff was incarcerated." *Watson v. United States*, 179 F. Supp. 3d 251, 262 (E.D.N.Y. 2016) [hereinafter *Watson IV*]. Watson told Officer Andren that he was a U.S. citizen and provided the names and phone number of his father and step-mother, who could verify his citizenship status. Prior to that interview, Officer Andren had received a packet of information from the New York State Department of Correctional Services that included a "New York City Department of Probation Pre-Sentence Investigation Face Sheet." App. 254. That document corroborated the names and phone

2

number of Watson's father and step-mother, and it clearly indicated that Watson was a U.S. citizen.

From the earliest stages of the investigation, then, there were clear indications that Watson was a citizen and therefore ineligible for removal. Yet Andren appears to have made almost no effort to verify Watson's claim of derivative citizenship. At trial, when asked if he ever contacted Watson's parents, Andren answered, "I don't recall calling them," App. 500, and the trial evidence indicated that he never successfully reached anyone at Watson's parents' phone number. Andren also introduced *errors* into the report he produced, pulling the alien files ostensibly for Watson's father and step-mother — Hopeton Ulando Watson and Clare Watson — but actually requesting the alien files of two entirely unrelated individuals *with different names*, Hopeton *Livingston* Watson and *Calrie Dale* Watson. As the district court succinctly noted after its bench trial,

> A reasonable person exercising even a modest amount of care would have recognized that these files did not—could not—belong to plaintiff's father or step-mother. The file for Hopeton Livingston Watson indicated that he lived in Connecticut and was not married; plaintiff told Officer Andren that his father lived in New York and was married. It also indicated that Hopeton Livingston Watson became a permanent resident of the United States on April 14, 2001, three years after plaintiff came to the United States as a permanent resident. And none of the children listed just a few pages into the file were named Davino Watson, or were listed as living in the United States. Each of these facts should have indicated that this was not the correct file. . . . It is obvious that the file for Calrie Dale Watson is not the correct file. In addition to the incorrect first name, this file shows that Calrie Dale Watson was married to a Gabriel Miller, not Hopeton Watson. The file indicates that the Watson name came from this individual's first husband, Rowan Eric Watson, who died in 1983.

3

*Watson IV*, 179 F. Supp. 3d at 263 (citation omitted). In short, rather than contact Watson's parents to ascertain plaintiff's naturalization history, Officer Andren ordered the incorrect alien files for Watson's parents, and to compound this error, "[n]either Officer Andren—who did not even wait for the files to arrive before making his decision—nor any other ICE official took reasonable steps to investigate plaintiff's well founded claim of United States citizenship." *Id.* The report Andren produced misidentified Watson's parents (and introduced a *new* error by referring to Watson's step-mother as "Claire" rather than either "Calrie" or, correctly, "Clare"), omitted their address and phone number, and stated that Watson was "a national and citizen of Jamaica" and that neither he nor his parents were U.S. citizens. App. 260.

Andren's report was passed on to his superior, Officer Juan Estrada, who conducted no independent investigation of his own and relied only on Officer Andren's report and the incorrect alien files to produce charging documents indicating that Watson's "parents are nationals and citizens of Jamaica who have not naturalized," so "[n]o issue of derivation applies," a conclusion which the trial court found "was flatly wrong." *Watson IV*, 179 F. Supp. 3d at 264 (emphasis omitted). An ICE attorney then reviewed the charging documents to confirm legal sufficiency to initiate removal proceedings without pursuing any independent verification of their accuracy, an action the district court labeled a "level of review [that] was effectively a mindless failure." *Id.* Finally, ICE Supervisory Deportation Officer Michael Ortiz "merely signed off on the obvious errors already committed," "a shirking of duty." *Id.* at 264–65.

As a result of this "grossly negligent" investigation, *Watson II*, 2015 WL 7281637, at *1, Watson was promptly taken into ICE custody upon his release from state prison on May 8, 2008. He was told at that time by the ICE officers who arrested him that the government had reason to believe that Watson was an alien eligible for removal as a result of his criminal convictions. Watson challenged their assertion, informing them that he was in fact a U.S. citizen, but ICE officers responded that Watson would appear before an immigration judge within 24 hours and could raise the issue then. Despite this representation, Watson ultimately did not appear before an IJ until June 25, 2008. Rather

incredibly, then, the government detained a U.S. citizen *for 48 days* before he even had the first opportunity to appear before a judicial officer to contest the basis for his detention. Despite Watson's immediate assertion that he was a citizen, no one from ICE ever circled back to interview Watson or reopen his file to determine if the government had made a mistake.

In addition to the ICE officers' negligence in initiating removal proceedings, the government also committed errors in asserting the ongoing legal basis for removal. At the time that Watson's father became a naturalized U.S. citizen in 2002, the BIA's interpretation of Jamaican legitimation law was governed by *Matter of Clahar*, 18 I. & N. Dec. 1 (B.I.A. 1981), which, as applied to Watson, meant that Watson — then a minor — immediately acquired derivative U.S. citizenship at the time of his father's naturalization. On June 4, 2008, however, the BIA decided *Matter of Hines*, 24 I. & N. Dec. 544 (B.I.A. 2008), which revised the BIA's interpretation of Jamaican legitimation law to such effect that, if applied to an individual similarly situated to Watson, that individual would *not* obtain derivative citizenship upon the naturalization of his/her father. Although Watson contended he had obtained derivative citizenship in 2002 — long before *Hines* was decided — the government's legal position after June 4, 2008, was that under *Hines*'s interpretation of Jamaican legitimation law, Watson had always been ineligible for derivative citizenship. The IJ's November 13, 2008, oral decision finding that Watson was not a citizen also relied on *Hines* as the basis for the ruling, rejecting any applicability of *Matter of Clahar*.

This conclusion of law is patently incorrect, because courts must "apply the law in effect when [an alien] fulfilled the last requirement for derivative citizenship," *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005), which in Watson's case was his father's naturalization in 2002. As explained above, *Matter of Clahar* was indisputably the law in effect at that time. Indeed, applying the "law in effect when the last material condition [of derivative citizenship] is met" has been *the BIA's* own longstanding rule. *In Re Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 163 (B.I.A. 2001) (citing *Matter of L—*, 7 I. & N. Dec. 512, 513 (B.I.A. 1957)). This is because "derivative citizenship is automatic; that is, when certain conditions exist, a child becomes a U.S. citizen even though neither parent, nor the child, has

5

requested it and regardless of whether any of them actually desires it." *Lewis v. Gonzales*, 481 F.3d 125, 131 (2d Cir. 2007) (per curiam); *see also* 8 U.S.C. § 1431. As a result, if an immigration judge is later charged with determining an alien's derivative citizenship status, the IJ must apply the law in effect at the time the last material condition for obtaining such citizenship was satisfied, even if, as of the date of adjudication, that law is no longer valid.[1] Had the government not urged an obviously incorrect legal justification for Watson's detention, or had the IJ caught the government's error and properly followed the law at Watson's November 13, 2008, removal hearing, Watson would have been spared an additional three years in detention.

## II. "Legal Process" in Immigration Detention and Removal Contexts

Turning now to Watson's intentional tort claims, while I agree with the majority that the district court's false imprisonment analysis was incorrect as a matter of law, I cannot join the majority's approach either. As an initial matter, we have never applied *Wallace*'s "legal process" test for distinguishing a false imprisonment claim from a malicious prosecution claim to immigration detention and removal, and there are reasons to doubt whether *Wallace*'s analysis, developed in response to a criminal prosecution, applies with equal measure to such proceedings. In *Wallace*, the Supreme Court highlighted the significance of "legal process" in distinguishing between a false imprisonment claim and a malicious prosecution claim in the context of a criminal prosecution,

---

[1] Even on its face, *Matter of Hines* is clearly limited only to *prospective cases*: the BIA declared that it would apply its revised understanding of Jamaican legitimation law only "in future cases," and by expressly stating that it was "now prompt[ed] . . . to overrule *Matter of Clahar*," it clarified that it would "*hereafter* deem a child born out of wedlock in Jamaica to be the 'legitimated' child of his biological father only upon proof that the petitioner was married to the child's biological mother at some point after the child's birth." *Matter of Hines*, 24 I. & N. Dec. at 548 (emphasis added). This language would seem to make clear that *Matter of Hines* did not have retroactive application, and so notwithstanding the "law in effect" rule, *Matter of Clahar* never ceased to be the controlling law as to Watson's derivative citizenship claim.

6

holding that because "false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process." 549 U.S. at 389 (emphasis omitted). *Wallace* emphasized that such process might be said to take place "when, for example, [a criminal defendant] is bound over by a magistrate or arraigned on charges." *Id.* Those procedures, of course, have no direct analogue in civil immigration removal proceedings, which do not trigger the panoply of rights guaranteed to criminal suspects pending trial.[2]

Critical among these rights, of course, is the right to counsel. The Supreme Court has held that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008). The Court has "pegged commencement" of the right to counsel "to the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 198 (internal quotation marks omitted). In the criminal context, then, the point at which legal process begins is the moment when a false imprisonment claim accrues, a potential malicious prosecution claim applies instead, and when the detainee is assured of the assistance of counsel.

---

[2] Another significant difference between criminal and civil removal proceedings that may counsel against *Wallace*'s applicability here is that in a criminal prosecution, the government must establish probable cause before a neutral body such as a judge or a grand jury in order to initiate a prosecution against a defendant. In the immigration context, no such independent ratification of probable cause is necessary to justify initiating removal proceedings, including detention. *See* 8 C.F.R. 239.1 (listing executive branch officers authorized to issue Notices to Appear). Nor, as Watson's experience makes abundantly clear, is there a requirement that the government establish probable cause (or something akin to it) to justify *maintaining* removal and detention pending a final decision as to removability. *See* 8 C.F.R. 1240.10.

7

The critical difference between the criminal and immigration removal proceedings is that no such assistance of counsel is ensured during the detention and removal process, which means that a detained individual — even a detained *U.S. citizen*, as Watson was — is forced to wage his legal battle against the government without the assistance of counsel if he cannot afford it. This is especially problematic in the context of removal proceedings because in the removal context, unlike the criminal context where the government must establish probable cause to initiate a prosecution, if the respondent was born overseas, "there is a presumption of alienage and the *respondent* has the burden of going forward with the evidence to establish a claim to United States citizenship." *Matter of Leyva*, 16 I. & N. Dec. 118, 119 (B.I.A. 1977) (emphasis added); *see also Gupta v. Lynch*, 661 F. App'x 737, 740 (2d Cir. 2016) ("Clear and convincing evidence that the petitioner was born abroad creates a presumption of alienage" which may be rebutted "only by proving, by 'a preponderance of the credible evidence,' that [the respondent] is a citizen notwithstanding his foreign birth."). Thus even though an immigration judge lacks jurisdiction to initiate removal proceedings against a U.S. citizen, as the majority acknowledges, *see* Maj. Op. at 12 n.8 (citing *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)), the legal burden to demonstrate citizenship, and therefore to establish a lack of jurisdiction, rests with the respondent.

The difference in legal burdens is also important when it comes to the immigration judge's decision as to removability. "A respondent charged with deportability shall be found to be removable if the [government] proves by clear and convincing evidence that the respondent is deportable as charged," 8 C.F.R. § 1240.8, an easier burden to meet than the criminal reasonable doubt standard. Yet this lesser level of proof leads to removal from the country — in Watson's case, his home from the time that he moved to the United States in 1998 at the age of 14. As the government itself acknowledges, "[t]he determination of whether a foreign-born person has derived citizenship involves complex legal and factual issues, and often requires consideration of foreign law and events that occurred outside the United States." Gov. Br. 47. U.S. citizens like Watson are often forced to go it alone in navigating these "complex legal and factual issues" involving the interpretation and application of foreign law without

8

counsel to assist them. Such respondents have limited capacity to gather evidence while detained pending removal, and are provided with little instruction into the applicable laws and doctrines, and yet have the burden of affirmatively establishing their citizenship to end removal proceedings and defeat the government's claim of deportability.

Thus even though Watson asserted his U.S. citizenship status at the very first interview with Officer Andren months before his detention, the New York State Department of Correctional Services files clearly corroborated that citizenship status, and Watson provided his parents' contact information to further confirm it, ICE officers apparently did not feel they were obligated to pursue any leads before detaining Watson and subjecting him to removal proceedings. Instead, it became *Watson's* burden to demonstrate that *Matter of Hines* had only prospective application and therefore did not control in his case; it was *Watson's* burden to explain that derivative citizenship claims are governed by the law in effect when the last prerequisite to citizenship is satisfied and that he satisfied such conditions; and it was *Watson's* burden to persuade the IJ that because *Matter of Clahar* was the controlling law at the time his father became a naturalized U.S. citizen in 2002, Watson automatically became a derivative citizen under *Clahar* the same day his father obtained citizenship.

It is not surprising that Watson was initially unable to prevail in his legal case before the IJ, and not simply because Watson had only a partial high school education, no legal training, and limited access to legal resources in the library of the detention facility where he was held. *Watson I*, 133 F. Supp. 3d at 523. After June 4, 2008, Watson's citizenship claim rested on establishing that *Matter of Clahar* rather than *Matter of Hines* controlled the interplay between Jamaican legitimation law and U.S. derivative citizenship law, a difficult issue of law that Watson was particularly ill-equipped to assert on his own while in detention. Indeed, government lawyers, the IJ, and *even the BIA* all overlooked the BIA's clear rule of law when incorrectly concluding that *Matter of Hines* and not *Matter of Clahar* controlled Watson's derivative citizenship status. It was not until we ordered that counsel be appointed from the Court's Pro Bono Panel that the legal argument about the inapplicability of *Matter of Hines* — and the applicability of

9

*Matter of Clahar* — first emerged; unfortunately, Watson did not have the assistance of counsel until July 2010, over two years into his detention. Once armed with the assistance of pro bono counsel, Watson's legal argument as to his citizenship was quickly put forward: on May 17, 2011, we heard argument on his case, and a mere two weeks later, on May 31, 2011, we remanded to the BIA to, in part, clarify the confusion between the BIA's seemingly conflicting interpretations of legitimation under *Matter of Clahar* and *Matter of Hines*. *See Watson v. Holder*, 643 F.3d 367, 369 (2d Cir. 2011). Within months, ICE Chief Counsel sent a memorandum recognizing Watson's probable citizenship, Watson was released the next day, and shortly thereafter, ICE filed a supplemental brief with the BIA acknowledging that *Matter of Hines* applied only prospectively and therefore *Matter of Clahar*, and not *Hines*, controlled Watson's derivative citizenship claim. *Watson IV*, 179 F. Supp. 3d at 268–69.

Despite all this, the majority states that "Watson was certainly held pursuant to [legal] process by the time an immigration judge ordered Watson's removal, which occurred on November 13, 2008." Maj. Op. at 11. In the abstract, certainly, that is not an unreasonable view, but it seems to me that the concept of "legal process" loses much of its significance in circumstances where the government's profound errors caused the problems that adversely affected the detainee, and where the detainee had no assistance of counsel and yet bore the difficult burden of establishing a claim of citizenship or else face the possibility of deportation, notwithstanding what in retrospect was a valid claim of citizenship all along. Thus Watson's November 13, 2008, hearing came over six months into his detention in large part because the IJ had previously adjourned the proceedings on three different occasions so that Watson could attempt (in vain) to obtain pro bono assistance. *Watson IV*, 179 F. Supp. 3d at 265–66. Because Watson could not afford counsel and because he was unable to obtain pro bono counsel, he was ultimately forced to proceed pro se.

Watson's experience is far from unusual. Respondents are often forced into just such an unfortunate dilemma: either seek to postpone the removal hearing (and therefore extend their time in detention) in the hope of obtaining pro bono counsel, or else push forward without counsel and face a *far* greater likelihood of

10

receiving an order of deportability. A recent study of immigration proceedings found that 60% of individuals in detention were unable to obtain access to counsel before their cases were completed, and that number rose for individuals who were transferred from New York to far-off detention centers like the Tensas Parish Detention Center in Louisiana that held Watson, where such individuals went without representation 79% of the time. *See Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings New York Immigrant Representation Study Report: Part 1*, 33 Cardozo L. Rev. 357, 363 (2011). The "legal process" to which Watson was subjected, moreover, is one in which the odds are stacked against him and similarly situated respondents. The same study found that being detained *and* lacking representation "drops the success rate dramatically" for the respondent: only 3% of individuals who are detained and who go without counsel have successful outcomes, as compared to 74% of individuals who are represented and are either released or never detained – a nearly *2400%* increase in the odds of prevailing. *Id.* at 363–64. Watson, of course, fell into the former group until we ordered the appointment of pro bono counsel two years into his detention; once armed with counsel, those who are represented but detained have successful outcomes 18% of the time, a *500%* increase in odds over those similarly situated but without counsel. *Id.*

      I raise these points to emphasize how much the assistance of counsel is central not only to the "legal process" of a criminal prosecution but also to immigration detention and removal proceedings. In the criminal context, "by the time a defendant is brought before a judicial officer, is informed of a formally lodged accusation, and has restrictions imposed on his liberty in aid of the prosecution, the State's relationship with the defendant has become solidly adversarial." *Rothgery*, 554 U.S. at 202. Given these considerations, it seems appropriate that the initiation of legal process coincides with the commencement of the right to the assistance of counsel. This is because, as the Supreme Court reflected in *Gideon v. Wainwright*, "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of

11

counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." 372 U.S. 335, 344–45 (1963) (quoting *Powell v. State of Ala.*, 287 U.S. 45, 68–69 (1932)). Yet these considerations are equally true of removal proceedings, and the need for adequate legal representation is particularly acute, not only because human beings stand to lose what Justice Brandeis described as "all that makes life worth living," *Ng Fung Ho*, 259 U.S. at 284, but also because there is a wide disparity in the success rate of those who have lawyers and those who proceed without counsel.

As the case at hand well demonstrates, adequate legal representation would serve not just the respondent, but also the government and the courts, which must adjudicate the difficult issues before them. Such representation is essential to the fair and efficient administration of justice. I believe the time has come to extend the right to counsel to immigration removal proceedings, and while I know that this is not the present state of the law, if there is any case where *meaningful* legal process cannot be said to have begun without the assistance of counsel, this, surely, is one.

### III.    Equitable Tolling

Because the majority concludes that Watson's false imprisonment claim accrued no later than November 13, 2008, and because that date was more than two years prior to the date Watson filed his administrative complaint, the majority holds that his cause of action was untimely. The majority then concludes that even after a bench trial, the district court abused its discretion in determining that Watson's specific circumstances warranted equitable tolling. Notwithstanding the open question as to when legal process can be said to have begun, I do not agree that the district court abused its discretion in deciding that equitable tolling was warranted. It is important to note that, to the best of my knowledge, our Circuit has only *once* reversed a district court that *granted* equitable tolling, and that unusual case concerned the tolling of a new cause of action added to an amended complaint on remand. *See Tho Dinh Tran v. Alphonse*

*Hotel Corp.*, 281 F.3d 23, 36–37 (2d Cir. 2002), *overruled by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).[3]

Below, the district court concluded that even if Watson's FTCA claims were untimely, they should be equitably tolled until July 31, 2014 – the date Watson was first informed that he had the right to sue the government. Among the factors the district court identified as warranting equitable tolling were Watson's eleventh-grade education, his lack of legal training, the significant depression that set in as a result of his detention, his lack of awareness that he could bring an FTCA action against the United States until he was informed by his legal counsel around July 31, 2014, and — most important in my mind — the fact that the government repeatedly told Watson that he was not a citizen, a position adopted by the IJ, affirmed by the BIA, and sustained by the government until after Watson's release from detention in November 2011. *Watson I*, 133 F. Supp. 3d at 523.

The Supreme Court has cautioned that in considering equitable tolling claims, courts of appeals must avoid a "standard [that] is too rigid," "emphasizing the need for flexibility, for avoiding mechanical rules." *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (internal quotation marks omitted). Accordingly, we have since recognized that "the exercise of a court's equity powers must be made on a case-by-case basis, mindful 'that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case,'" *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (quoting *Holland*, 560 U.S. at 649–50). "The 'flexibility' inherent in 'equitable procedure' is necessary 'to meet new situations [that] demand equitable intervention' . . . [where] specific circumstances, often hard to predict in advance, could warrant

---

[3] In *Tho Dinh Tran*, the district court equitably tolled an untimely RICO action added to plaintiff's amended complaint after a remand from our Circuit, under a doctrine permitting such tolling if a plaintiff established fraudulent concealment of a RICO violation. *Id*. at 36. We reversed the grant of equitable tolling because "[t]he plaintiff did not establish any of the elements of equitable tolling at trial and did not argue in its post-trial briefs that he had done so." *Id*. at 37.

special treatment in an appropriate case.'" *Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011) (quoting *Holland*, 560 U.S. at 650).

In my view, the majority applies our precedents too mechanically, *contra Holland*, 560 U.S. at 650, rather than considering the "specific circumstances" Watson confronted in their totality. The majority concludes that equitable tolling cannot "be premised on Watson's lack of education, pro se status, or ignorance of the right to bring a claim," Maj. Op. at 14, but it bases this broad statement on just two prior cases in which courts found that *one of these factors alone*, given the particular circumstances of the case at hand, was insufficient to warrant equitable tolling. Thus, this Court has previously held that a plaintiff's *pro se* status *alone* did not constitute extraordinary circumstances, *see Smith v. McGinnis*, 208 F.3d 13, 18 (2d Cir. 2000) ("Smith's *pro se* status until March 1997 does not merit equitable tolling."), not that a lack of legal knowledge or access to legal resources can *never* be *a factor* in equitable tolling analysis. *Cf. Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (anticipating a probable grant of equitable tolling in a hypothetical case where "deprivation of a prisoner's access to his own legal materials and law library materials prevented a prisoner from" filing (emphasis omitted)). Similarly, the Supreme Court has observed that a party's own "mistaken reliance [of law]," when "not an obstacle beyond its control," *by itself* did not constitute an extraordinary circumstance, but explicitly left open whether a reasonable mistake of law could, in some circumstances, constitute the extraordinary circumstances justifying equitable tolling. *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 756 & n.3 (2016) ("[W]e need not decide whether a mistake of law, however reasonable, could ever be extraordinary."). The Supreme Court's decision in *Menominee Indian Tribe* certainly does not stand for the proposition that the *government's* persistent and clearly mistaken legal position taken at plaintiff's detriment can *never* be relevant to equitable tolling analysis.

The majority also summarily concludes that "Watson's depression cannot justify equitable tolling" because it "did not prevent him from contesting his citizenship before the immigration judge, so it could not have prevented him from filing his administrative claim for damages." Maj. Op. at 14. Yet we have

14

previously found that mental health issues *can* provide the basis to grant equitable tolling. *See Harper*, 648 F.3d at 137; *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010). The expert who assessed Watson and who testified at trial diagnosed Watson with adjustment disorder, "a mental disorder that is characterized by an intense emotional reaction to an identifiable stressor," in this case, brought on by Watson's ICE detention. App. 505–06. The expert identified "clinical symptoms of depression and anxiety," including "hopelessness and isolation," as Watson was cut off from his family and reported that he considered hanging himself while in detention. App. 506. The expert also testified that for individuals "incarcerated improperly, the psychological effect [of incarceration] is much greater; there's much more distress" because they know they are innocent and yet "ha[ve] to fight for their life." App. 507–08. Whether a physical or mental health condition "did in fact inhibit . . . or otherwise impair" one's ability to act such that it "might excuse the tardy filing" is a question of fact to be found by the trial court. *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002). Because I do not think Watson's ability to "contest[] his citizenship before the immigration judge," Maj. Op. at 14, *necessarily* means that Watson's depression could not have prevented him from pursuing additional, independent relief in the form of an FTCA action, I do not share the majority's view that the district court's factual finding was clearly erroneous.

      Most critically, in my mind, is the fact that here, ICE officers, government lawyers, the IJ, and the BIA, all incorrectly and repeatedly asserted for nearly three and a half years that Watson did not satisfy the legal requirements for derivative citizenship and that his detention throughout was thus lawful. Such a circumstance is far from the "entirely common state of affairs" contemplated by *Wallace*. After *Matter of Hines* was decided on June 4, 2008, Watson was told by the government that his detention was lawful because of *Hines*'s supposed applicability to his case, and so Watson's potential false imprisonment claim rested on a question of law – *i.e.*, whether Jamaican legitimacy law as interpreted in *Matter of Hines* or in *Matter of Clahar* controlled his derivative U.S. citizenship claim. This question of law, of course, was not something Watson, a pro se litigant, could easily know on his own, especially in light of the government's repeated erroneous assertions that he had no legal claim to citizenship,

15

notwithstanding Watson's belief that he had possessed derivative citizenship since his father's naturalization in 2002. This is a distinct contrast from the typical criminal case, where the defendant knows whether he committed the actions purportedly justifying his arrest and therefore knows whether his detention is actually supported by probable cause. In those circumstances, such as the one contemplated in *Wallace*, the defendant knows that he did not take the actions alleged, and armed with the knowledge of the absence of probable cause, he may be confident that his imprisonment is false and that a potential tort claim should eventually have merit. As discussed above, until Watson had access to counsel, he had to confront alone the deeply flawed assertions of governmental authorities that he had no legal claim to citizenship. As a result, Watson was not able to articulate a legal basis for his claim of citizenship even for the purposes of preventing his removal, let alone to anticipate and assess the legal basis for a potentially meritorious false imprisonment suit. Given the "specific circumstances" of Watson's detention, I cannot conclude that the district court abused its discretion in concluding that this was an "appropriate case" warranting "special treatment." *Holland*, 560 U.S. at 650.

As to diligence, "the district court should consider all of the relevant facts and circumstances . . . to determine, utilizing its own discretion, whether the plaintiff . . . [was] sufficiently diligent." *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 153 (2d Cir. 2013). The Supreme Court has cautioned that "[t]he diligence required for equitable tolling purposes is *reasonable diligence,* not maximum feasible diligence." *Holland*, 560 U.S. at 653 (emphasis added) (citation and internal quotation marks omitted). Below, the district court emphasized that Watson diligently attempted to establish his legal status as a U.S. citizen in his immigration proceedings, evinced by the fact that he "promptly and continuously asserted his citizenship, and took every action he knew of—or could reasonably be expected to know of—to demonstrate that he was a citizen," *Watson I*, 133 F. Supp. 3d at 523, all while ICE officers, government lawyers, the IJ, and even the BIA repeatedly asserted that as a matter of law Watson was not a citizen and should be deported. From the beginning, Watson had provided the correct information for his father to establish the link to his claim of derivative citizenship, and within two months of his detention had obtained and provided a

16

copy of his father's certificate of naturalization. Watson also filed an N-600 application for a certificate of citizenship, which was denied by USCIS on the basis of its wrongful reliance on *Matter of Hines*. Watson appealed this determination to USCIS's Administrative Appeals Office, which dismissed his appeal. Despite Watson's repeated insistence that he was a citizen, until November 2011 the government maintained that Watson was a removable alien, which was effectively ratified when the IJ concluded that Watson was an alien eligible for removal. Watson pursued his claim through multiple appeals to the BIA and the Second Circuit; eventually, the Second Circuit remanded his case to the BIA, at which point ICE released him shortly thereafter, without explanation, on November 2, 2011. Even at the time Watson was released, he was not yet told that the government now believed Watson had been a U.S. citizen all along; rather, he was only notified that the government had changed its position when ICE filed its supplemental brief with the BIA determining that *Matter of Hines* did not have retroactive effect. Watson also testified that there were few resources about the law available to him while he was in detention, and that he received no assistance from the guards or anyone else about his legal options. Finally, Watson was also diligent in filing his claim upon release. Watson was made aware in November 2011, shortly after his release, that his detention was unlawful when the government conceded that Watson had been a citizen all along. Watson filed his administrative tort claim within the two-year limitations window from the day his detention was terminated and he was released.

I do not believe the district court abused its discretion in finding that Watson had pursued his claims with "reasonable diligence," *Holland*, 560 U.S. at 653 (internal quotation marks omitted), given that Watson did everything possible to assert his citizenship in the face of colossal government failure resulting in his 1,273-day detention, and given that he had no assistance of counsel during the first two years of that detention and little access to legal resources throughout it. All the while, the government maintained that Watson was not a citizen as a matter of law and was therefore ineligible for relief. It is not clear to me how, under these circumstances, Watson should have known in 2008 that he needed to file an administrative tort claim to preserve a possible tort claim that could not possibly succeed until the government acknowledged his

17

derivative citizenship over three years later, let alone know that his false imprisonment claim would accrue a few months into his three-and-a-half year detention. Given that even *now* we are uncertain as to precisely how to determine when legal process begins and a false imprisonment claim accrues, *see* Maj. Op. at 11–12, it is difficult for me to think that Watson had adequate notice himself.

Given "all of the relevant facts and circumstances," *Phillips*, 723 F.3d at 153, I do not think the district court abused its discretion in finding that Watson both exhibited "reasonable diligence" and faced extraordinary circumstances warranting equitable tolling.

### IV. Conclusion

I would hope that nothing about Watson's 1,273-day detention can be said to have been "an entirely common state of affairs." Maj. Op. at 14–15 (quoting *Wallace*, 549 U.S. at 396). If it were, we should all be deeply troubled. An American citizen was detained on the basis of a "grossly negligent" investigation that "led to [his] wrongful detention." *Watson II*, 2015 WL 7281637, at *1. The government, the IJ, and the BIA all misapplied clear precedents of law, which, coupled with Watson's lack of counsel until mid-2011, resulted in his three-and-a-half-year detention. Watson had an eleventh-grade education, suffered from depression as a result of his detention, and was repeatedly told by ICE officials, government lawyers, the IJ, and the BIA that he was not a U.S. citizen and that he would be removed from the country he had known as his home from the time he was 14 years old. Given all this, I cannot conclude that the "legal process" Watson experienced should extirpate his legal claims, nor can I draw the conclusion that the district court abused its discretion in determining that Watson's case merited equitable tolling. Although I join the majority's disposition of Watson's malicious prosecution and negligence claims, I cannot join the rest of the decision. I am hopeful that one day soon no immigrant *or* citizen will be forced to go through a predicament like Watson's without the assistance of counsel to help vindicate his cause.