# 16-655(L)

## 16-1357(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

❖❖❖

DAVINO WATSON,

*Plaintiff-Appellant-Cross-Appellee,*

—against—

UNITED STATES OF AMERICA,

*Defendant-Appellee-Cross-Appellant,*

JUAN ESTRADA, MICHAEL ORTIZ, TIMOTHY GUNTHER, JOHN DOES, 1-8,

*Defendants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## PETITION FOR REHEARING AND REHEARING *EN BANC*

MARK FLEMING
NATIONAL IMMIGRANT
  JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
(312) 660-1628

MARK A. FLESSNER
HOLLAND & KNIGHT LLP
131 South Dearborn Street, 30th Floor
Chicago, Illinois 60603
(312) 263-3600

ROBERT J. BURNS
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3200

*Attorneys for Plaintiff-Appellant-Cross-Appellee*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... II

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT .......................................................................................... 5

I. REHEARING OR *EN BANC* CONSIDERATION IS NECESSARY BECAUSE THE PANEL'S DECISION CONFLICTS WITH *WALLACE*. ............................................... 5

    A. The Common Law Of Torts Controls The Meaning Of "Legal Process" Under *Wallace*. .............................. 6

    B. Under The Common Law Of Torts, Legal Process Requires Officers Either To Exercise Valid Subject-Matter Jurisdiction Or To Be Reasonably Unaware That They Lack Jurisdiction. ................................................ 8

    C. Watson Never Received Legal Process Because The Immigration Officials Should Have Known They Lacked Jurisdiction. .......................................................... 11

II. REHEARING OR *EN BANC* CONSIDERATION IS NECESSARY TO MAINTAIN UNIFORMITY OF EQUITABLE TOLLING DECISIONS. ............................................. 13

CONCLUSION ..................................................................................... 15

i

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Ashton v. Gonzales,*
    431 F.3d 95 (2d Cir. 2005) ................................................................12

*A.Q.C. ex rel. Castillo v. U.S.,*
    656 F.3d 135 (2d Cir. 2011) ..............................................................7

*Carey v. Piphus,*
    435 U.S. 247 (1978) ............................................................................6

*Dillon v. Conway,*
    642 F.3d 358 (2d Cir. 2011) ..............................................................13

*Duarte-Ceri v. Holder,*
    630 F.3d 83 (2d Cir. 2010) ................................................................12

*Fernandez v. Chertoff,*
    471 F.3d 45 (2d Cir. 2006) ................................................................13

*Gall v. U.S.,*
    552 U.S. 38 (2007) ................................................................4, 14, 15

*Heck v. Humphrey,*
    512 U.S. 477 (1994) ............................................................................6

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
    134 S. Ct. 1744 (2014) ......................................................................14

*Holland v. Florida,*
    560 U.S. 631 (2010) ....................................................................13, 15

*Molzof v. United States,*
    502 U.S. 301 (1992) ............................................................................7

*Ng Fung Ho v. White,*
    259 U.S. 276 (1922) ..........................................................................12

*Wallace v. Kato,*
    549 U.S. 384 (2007) ...................................................................*passim*

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) ...............................................................14

**Statutes**

8 U.S.C. § 1226 ....................................................................................11

8 U.S.C. § 1229 ...............................................................................11, 12

8 U.S.C. § 1357 ....................................................................................11

28 U.S.C. § 2674 ....................................................................................7

28 U.S.C. § 2680(h) ...............................................................................7

**Secondary Sources**

1 F. Harper & F. James, *Law of Torts* (1956) ...............................9, 10, 13

8 S. Speiser, C. Krause, & A. Gans, *American Law of Torts* (2011) ..................8, 9

H. Stephen, *The Law Relating to Actions for Malicious Prosecution*
    (1889) ..............................................................................................10

M. Newell, *Law of Malicious Prosecution, False Imprisonment, and
    Abuse of Legal Process* (1892) ...........................................................9

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on
    Law of Torts* (5th ed. 1984) ....................................................9, 10, 12

## **PRELIMINARY STATEMENT**

This case is about a United States citizen, Davino Watson, who was wrongfully detained and subject to removal proceedings by Immigration and Customs Enforcement for three-and-a-half years. His detention was based on an investigation into his citizenship that was "beset by errors," Maj. Op. at 5, and the government's reliance on an "obviously incorrect legal justification" ordering his removal. Dissenting Op. at 6. Watson brought an action for false imprisonment under the Federal Tort Claims Act ("FTCA") and won damages at trial, but the Majority ruled the action accrued over two years before he filed his claim and was therefore time barred. The effect of this ruling reaches beyond accrual, however: it rewrites the law of false imprisonment in this Circuit to bar recovery for illegal government detentions for which the government has no reasonable excuse because the illegality was obvious. Because recovery *is* available in such circumstances at common law, the Majority has departed from Supreme Court precedent requiring this Court to apply common-law tort rules where the FTCA is otherwise silent.

The Majority held that the statute of limitations began to run when an immigration judge ordered Watson's removal from the United States, years before his release from custody. According to the Majority, the formal proceedings giving rise to this order were "legal process" under the meaning of Supreme Court precedent—the point at which a court begins to exercise valid jurisdiction over a

1

detainee and the tort of false imprisonment ends. The Majority also concluded that the district court abused its discretion in ruling that Watson would be entitled to equitable tolling of his action were it not timely. The Majority's opinion deserves a second look for two reasons.

First, the opinion conflicts with the common-law-based inquiry prescribed by Justice Scalia in *Wallace v. Kato*, 549 U.S. 384 (2007), for determining when false imprisonment by government officials has ended. Despite clear differences between Watson's civil immigration proceedings and the criminal justice context in which *Wallace* was decided, the Majority assumed that Justice Scalia's passing description of "legal process" was sufficient to govern the civil immigration context. Justice Scalia had no need to provide a comprehensive definition of "legal process" in *Wallace* because in that case it was sufficient to decide that legal process certainly occurs "when . . . [a criminal defendant] is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389. The civil immigration context is not sufficiently analogous to apply this language wholesale. *See* Dissenting Op. at 7 ("[Criminal] procedures, of course, have no direct analogue in civil immigration removal proceedings, which do not trigger the panoply of rights guaranteed to criminal suspects pending trial.").

Instead, binding Supreme Court precedent requires this Court to follow Justice Scalia's lead in *Wallace* and turn to the common law to ascertain when false

imprisonment ends in the civil immigration context. Under these well-established common-law rules, false imprisonment does not end simply because a judicial officer ratifies a detention in an apparently ordinary formal proceeding. A detention qualifies as false imprisonment for as long as responsible officials (1) lack jurisdiction to detain and (2) *should know* based on clearly established law and the facts before them that they lack jurisdiction. Accordingly, "legal process," the phrase that Justice Scalia borrowed from a treatise to demarcate the end of a false imprisonment tort, is a term of art that refers to any valid exercise of jurisdiction in which an official *reasonably* applies the law to the facts as he understands them. "Legal process" thus requires more than the basic fact that a formal proceeding was held; it is not enough for the proceeding simply to appear in form like the kind over which a judicial officer normally presides.

The Majority omits any discussion of the common law of torts, let alone these specific provisions. The opinion deems a false-imprisonment tort to have concluded whenever officials ratify a detention in any "trial-like proceeding," no matter whether subject-matter jurisdiction lies or how unreasonable the justification for detention. *See* Maj. Op. at 11. Under this ruling, a United States citizen illegally subjected to immigration detention—or any plaintiff detained after a formal proceeding by an entity lacking jurisdiction to detain her—has no remedy even when the detention is patently unreasonable. Malicious prosecution is a conceivable

alternative, but it requires a showing of malice. Essentially, the Majority holds that any detainee illegally held because of gross negligence short of actual malice is without a remedy, contrary to the relief the common law of false imprisonment would make available in such circumstances.

Because the jurisdictional basis adopted by the government for Watson's detention was "obviously incorrect," *see* Dissenting Op. at 6, none of the proceedings ratifying his detention constituted "legal process" at common law. Watson respectfully asks this Court to align its approach with that of the common law supporting Justice Scalia's opinion in *Wallace* and to conclude that his false imprisonment ended when he was physically released on November 2, 2011.

Second, this case deserves rehearing because the Majority failed to show any meaningful deference to the district court's equitable-tolling ruling. In essence, "[a]lthough the [Majority] correctly stated that the appropriate standard of review was abuse of discretion, it engaged in an analysis that more closely resembled *de novo* review." *Cf. Gall v. U.S.*, 552 U.S. 38, 56 (2007). As Chief Judge Katzmann noted, the Majority's decision is unprecedented. Dissenting Op. at 1 ("To the best of my knowledge, this is the first time this Circuit has *ever* reversed a district court's decision to grant equitable tolling in such a fashion . . . ."). The Majority took a leap in this case where the plaintiff undertook diligent efforts to secure his citizenship rights despite consistently being told by every level of the federal immigration

4

bureaucracy that he was not, in fact, a citizen. Equitable tolling is just that—equitable—but the Majority treated the issue mechanically, contrary to precedent.

## ARGUMENT

## I.  REHEARING OR *EN BANC* CONSIDERATION IS NECESSARY BECAUSE THE PANEL'S DECISION CONFLICTS WITH *WALLACE*.

The precise statutory-limitations issue is whether Watson experienced "legal process" under the meaning of *Wallace* when an immigration judge ordered his removal on November 13, 2008 or during any prior formal immigration proceeding. If the Majority is correct that he did, then the tort of false imprisonment ended, and the clock began to run on his FTCA claim. But this issue is about more than accrual dates. In ruling on accrual, the Majority unduly shrinks the scope of the tort of false imprisonment itself, eliminating relief in circumstances where the common law expressly allowed it.

Watson respectfully submits that (1) *Wallace* and prior precedent prescribe close adherence to common-law principles in deciding when the tort of false imprisonment ends, and (2) those common-law principles are clear that formal proceedings do *not* cut off liability in cases such as Watson's, where the government's lack of subject-matter jurisdiction should have been obvious under clearly established law and the facts known to officials. Rehearing is necessary to bring this Circuit's jurisprudence into conformity with the Supreme Court's common-law-based approach to defining the scope of false imprisonment.

5

## A. The Common Law Of Torts Controls The Meaning Of "Legal Process" Under *Wallace*.

The term "legal process" referenced in *Wallace* was not a new invention. Justice Scalia lifted the concept directly from common-law treatises describing false imprisonment and malicious prosecution in depth. *See Wallace*, 549 U.S. at 388-90. And his deference to common-law concepts in resolving the accrual issue in *Wallace* was required by precedent. Whenever Congress creates a new "species of tort liability" through a statute such as § 1983, there is a presumption that the statute incorporates common-law rules, absent contrary direction from Congress. *See Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (quoting *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978)) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well.").

This principle demonstrates why *Wallace*, although a §1983 case, governs this case also: the FTCA, like §1983, creates a new species of tort liability that requires courts to borrow from common-law concepts whenever those concepts are necessary to decide statutory questions. In interpreting the FTCA, courts must apply this "cardinal rule of statutory construction":

> [W]here Congress borrows terms of art in which are
> accumulated the legal tradition and meaning of centuries
> of practice, it presumably knows and adopts the cluster of
> ideas that were attached to each borrowed word in the
> body of learning from which it was taken and the meaning
> its use will convey to the judicial mind unless otherwise
> instructed. In such case, absence of contrary direction may
> be taken as satisfaction with widely accepted definitions,
> not as a departure from them.

*Molzof v. United States*, 502 U.S. 301, 307 (1992) (internal quotation marks

omitted). This rule of statutory construction "carries particular force in interpreting

the FTCA" because "[c]ertainly there is no warrant for assuming that Congress was

unaware of established tort definitions when it enacted the Tort Claims Act in 1946"

after spending twenty-eight years drafting it. *Id.* at 307-08 (internal quotation marks

omitted).

In determining whether the United States is liable for "false imprisonment,"

*see* 28 U.S.C. § 2680(h), "in the same manner and to the same extent as a private

individual under like circumstances," *see* 28 U.S.C. § 2674, the common law of false

imprisonment provides the answer to any purely federal question pertaining to relief.

The accrual date of Watson's FTCA claim is such a question. *See A.Q.C. ex rel.*

*Castillo v. U.S.*, 656 F.3d 135, 139 (2d Cir. 2011) ("Federal law determines the date

that an FTCA claim accrues."). So the "legal process" inquiry in *Wallace* controls.

The novel issue presented by this case is whether and when formal civil immigration

proceedings constitute "legal process" under the common law. To follow *Wallace*

faithfully, this Court cannot assign its own meaning to the phrase "legal process" as though it were an invention of the Supreme Court rather than from common law. If common law defines the concept at issue, then common law is dispositive.

Nevertheless, the Majority failed to incorporate the common law of torts into its analysis. In light of the clear differences between the criminal justice system and the civil immigration system, this Court should look to treatises to explain when official actions terminate liability for false imprisonment. Supreme Court precedent makes clear that this Court's *obligation* is to do the same, rather than assume a meaning of "legal process" with no reference to established definitions.

### B. Under The Common Law Of Torts, Legal Process Requires Officers Either To Exercise Valid Subject-Matter Jurisdiction Or To Be Reasonably Unaware That They Lack Jurisdiction.

The general rule at common law is that the tort of false imprisonment lies whenever a court lacks personal or subject-matter jurisdiction to detain a plaintiff. Indeed, the absence of legal authority under which to detain a plaintiff is what defines false imprisonment and distinguishes it from malicious prosecution. "In false imprisonment, . . . the essence of the tort consists in depriving the plaintiff of his or her liberty without lawful justification." 8 S. Speiser, C. Krause, & A. Gans, *American Law of Torts* § 27:2 (2011) ("Speiser, Krause, & Gans"). The presence or absence of valid jurisdiction is what determines whether the detention is "lawful." "Where the court has no jurisdiction over the subject matter, trespass is the proper

form of action . . . for any act which independently of the process would be remedied by this action."[1]  M. Newell, *Law of Malicious Prosecution, False Imprisonment, and Abuse of Legal Process*, Ch. III § 3, p. 89 (1892); *see also* Speiser, Krause, & Gans (recognizing the interruption of false-imprisonment liability only where process is "issued by a court of competent authority").[2]  Put another way, "whenever a legal duty to release another from confinement can be made out, an intentional refusal to do so is sufficient for false imprisonment; but of course without such a duty there is no tort."[3]  W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 11, p. 51 (5th ed. 1984) ("Prosser & Keeton").

There is an exception to this rule for reasonable mistakes.  It recognizes that there is a significant public policy interest in shielding executive officers from liability where it was unclear that they lacked authority to detain.  *See* 1 F. Harper & F. James, *Law of Torts* § 3.17, p. 269 (1956) ("Harper & James") ("[I]n order to secure a prompt and effective service of legal process, the law protects its officers in the performance of their duties, if there is no defect or want of jurisdiction apparent on the face of the writ or warrant under which they act.").  The question of

---

[1] "At common law, the proper action for a false imprisonment was trespass whereas for malicious prosecution it was case."  1 F. Harper & F. James, Law of Torts § 3.9, p. 232 (1956).

[2] The *Wallace* Court relied on versions of these and other treatises cited in this Petition.

[3] Pretrial detention in a criminal case is legally valid even if probable cause is fabricated because of the criminal court's valid subject-matter jurisdiction over the accused.  In such a case, there is no legal duty to release the accused, and malicious prosecution is the only tort available. *See* Harper & James at 232.  In contrast, detention without jurisdiction is wholly invalid and creates a legal duty to release the detained.

whether process is void or invalid on its face is simply whether officials had sufficient notice of the limits of their authority. "[T]he weight of modern authority is that where the defendant has attempted to comply with legal requirements, and has failed to do so *through no fault of the defendant's own*, false imprisonment will not lie, and the remedy is malicious prosecution." Prosser & Keeton at 54 (emphasis added).

"Process which is void on its face," meaning "that its invalidity can be ascertained by examination[,] will afford no protection to the officer relying thereon." Harper & James at § 3.17, p. 270. Judges are held to the same standard as other officers: "Where the judge acts without jurisdiction over the subject or person, he is liable if he *could and should have known* of his lack of authority." *Id.* at § 3.21, p. 295 (emphasis added). This rule gives substance to the statement that the tort of false imprisonment is for "the defendant having done that which, upon the stating of it, is manifestly illegal," *i.e.*, the illegality was or should have been manifest to the government. *See* H. Stephen, *The Law Relating to Actions for Malicious Prosecution* 103, *120-21 (1889) ("Stephen").

The Majority contravenes these common-law rules, assuming instead that false imprisonment ends whenever a plaintiff undergoes any formal legal proceedings related to the detention, regardless whether officials lack jurisdiction or have sufficient notice that they lack jurisdiction. *See* Maj. Op. at 11 (suggesting that

"several potential dates" could mark the end of Watson's false imprisonment apparently because Watson had formal interactions with the immigration court on those dates). If this were true, however, there would be no reason for common-law treatises to include entire sections dedicated to situations where government officials detain plaintiffs according to formal process.

Similarly, it cannot be that the government's "jurisdiction to *consider*" whether it has subject-matter jurisdiction immunizes the government from liability. *See* Maj. Op. at 12 n.8 (emphasis original). This would swallow the common-law rules and improperly preclude liability in every case. Every detaining officer or court has a threshold obligation to ascertain whether it properly possesses subject-matter jurisdiction, yet the common law is clear that liability still attaches to the decisions of officials lacking such jurisdiction. The fact that immigration judges regularly determine if they have jurisdiction does not cut off liability if a judge makes an obviously illegal decision. The regular nature of the determination is relevant only to whether officials were *reasonably unaware* they lacked jurisdiction. The question remains whether the facts or law denying jurisdiction were clear.

## C. Watson Never Received Legal Process Because The Immigration Officials Should Have Known They Lacked Jurisdiction.

No executive official in this case had subject-matter jurisdiction to detain Watson. ICE lacks authority to arrest, detain, or initiate removal proceedings against U.S. citizens. *See generally* 8 U.S.C. §§ 1226, 1229, 1357(a)-(d); (A274-76) ("As a

matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a USC"). Likewise, an immigration judge lacks jurisdiction to conduct removal proceedings against a U.S. citizen. *See* 8 U.S.C. § 1229a(a). "Jurisdiction … exists only if the person arrested is an alien. The claim of citizenship is thus a denial of an essential jurisdictional fact." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922); *see Duarte-Ceri v. Holder*, 630 F.3d 83, 87 (2d Cir. 2010) (quoting *Ng Fung Ho* in concluding "[a]n assertion of U.S. 'citizenship is . . . a denial of an essential jurisdictional fact' in a deportation proceeding"). In sum, the government had a clear legal duty to release Watson. *See* Prosser & Keeton at § 11, p. 51 (this duty is sufficient to make out a claim for false imprisonment).

Further, the immigration officials' failure to recognize their lack of jurisdiction was unreasonable. The immigration judge's November 13, 2008 decision ordering Watson's removal relied on a "patently incorrect" conclusion of law. Dissenting Op. at 5. The immigration judge erroneously relied on a 2008 Board of Immigration Appeals ("BIA") decision despite the established rule that "courts must 'apply the law in effect when [an alien] fulfilled the last requirement for derivative citizenship,' which in Watson's case was his father's naturalization in 2002." *Id.* (quoting *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005)). This also was the BIA's own rule. *Id.* It is undisputed that the immigration judge would have reached the opposite result had he applied the law in effect in 2002. *See id.*

12

The immigration judge thus should have "ascertained by examination" that Watson was a U.S. citizen outside his subject-matter jurisdiction. *See* Harper & James at § 3.17, p. 270. His detention order cannot shield against liability under the common law simply by being a detention order. For this reason, this Court should rehear the case and conclude that the statute of limitations for Watson's FTCA claim began to run at his release from custody, as no "legal process" under the meaning of *Wallace* or the common law intervened to cut off liability before that time.

## II. REHEARING OR *EN BANC* CONSIDERATION IS NECESSARY TO MAINTAIN UNIFORMITY OF EQUITABLE TOLLING DECISIONS.

This Court reviews an equitable tolling decision for abuse of discretion. *Fernandez v. Chertoff*, 471 F.3d 45, 51 (2d Cir. 2006). The Majority acknowledged this, but—in conducting what amounted to an independent *de novo* review of the district court's equitable tolling determination—failed to give appropriate deference to the district court's factual findings. Moreover, the Majority employed too rigid an approach to precedent, contrary to the Supreme Court's instruction that "a court of equity must 'exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case.'" *See Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011) (quoting *Holland v. Florida*, 560 U.S. 631, 650 (2010)). The result was that the Majority reversed a district court's grant of equitable tolling for

apparently the first time in this Circuit.[4]  Rehearing is necessary to assess whether this extraordinary ruling can be squared with this Court's precedents.

First, the Majority merely substituted its own judgment for the district court's despite the axiom that trial courts naturally have a better vantage point on the facts. One aspect of this "institutional advantage" is that trial courts can more easily compare cases to one another to determine which cases are truly exceptional.  *See Gall*, 552 U.S. at 52 (district court better able to decide whether variance warranted in sentencing); *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014) (district court "'is better positioned' to decide whether a case is exceptional" when awarding fees in patent cases).  Here, the district court exercised its sound discretion in finding as a factual matter that the combined effect of depression, government interference, and a number of other factors was extraordinary and slowed Watson's pursuit to secure his rights.  *See* Mem. Op. and Order, dated Sept. 29, 2015, at 34-35.

Instead of explaining why the district court was *necessarily wrong*, *i.e.*, that its judgment fell outside a "range of permissible decisions," *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001), the Majority simply disagreed.  In the Majority's view, Watson's "vigorous" attempts to contest his removal prove that

---

[4] Like Chief Judge Katzmann, the undersigned are not aware of any cases in which this has happened before.  *See* Dissenting Op. at 1.

14

neither his depression nor the government's repeated insistence he was an alien could have deterred him from filing a claim. *See* Maj. Op. at 13-14. Putting aside the lack of nuance in this analysis of the subject of Watson's mental health and confusion,[5] this reasoning disregards numerous evidentiary hearings and opportunities for personal observation taken by the district court. *See* Dissenting Op. at 14-18; *see generally Gall*, 552 U.S. at 51-52.

Second, the Majority mechanically applied this Court's precedents as though they provided rigid rules regarding which factors were permissible to consider. *See, e.g.*, Maj. Op. at 14 (concluding "equitable tolling [cannot] be premised on Watson's lack of education, pro se status, or ignorance of the right to bring a claim" to any extent). As Chief Judge Katzmann explained, it is improper to deny that Watson's case is extraordinary by arguing that various aspects of his circumstances are ordinary in isolation. *See* Dissenting Op. at 13-14. The 'exercise of a court's equity powers ... must be made on a case-by-case basis.'" *Holland*, 560 U.S. at 649-50.

## CONCLUSION

For the foregoing reasons, Watson respectfully requests that this Court grant his Petition for Rehearing either before the panel or *en banc*.

---

[5] It is incredible to assert with no further explanation that depression could not have prevented Watson from filing an administrative claim because it did not prevent him from contesting his removal. *See* Maj. Op. at 14. Depression, like the exercise of a court's power in equity, is not nearly so black and white. *See* Dissenting Op. at 15.

15

Dated:      New York, New York
              September 12, 2017


                Respectfully submitted,

                HOLLAND & KNIGHT LLP


By:   /s/ Mark A. Flessner
        Mark A. Flessner
        Robert J. Burns

        131 South Dearborn Street, 30th Floor
        Chicago, Illinois  60603
        Tel.:  (312) 263-3600
        Fax:  (312) 578-6666

        31 West 52nd Street
        New York, New York  10019
        Tel.:  (212) 513-3200
        Fax:  (212) 385-9010

        Email:  mark.flessner@hklaw.com
                 robert.burns@hklaw.com

# ADDENDUM

16-655(L)
Watson v. United States

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: April 6, 2017    Decided: July 31, 2017)

Docket Nos. 16-655 (L), 16-1357 (XAP)

- - - - - - - - - - - - - - - - - - -x

DAVINO WATSON,

　　　　　Plaintiff-Appellant-Cross-Appellee,

　　　- v.-

UNITED STATES OF AMERICA,

　　　　　Defendant-Appellee-Cross-Appellant,

JUAN ESTRADA, MICHAEL ORTIZ, TIMOTHY GUNTHER, JOHN DOES, 1-8,

　　　　　Defendants.

- - - - - - - - - - - - - - - - - - -x

　　Before:　　KATZMANN, Chief Judge, JACOBS, and LIVINGSTON,
　　　　　　　Circuit Judges.

Case 16-655, Document 149, 09/13/2017, 2123503, Page23 of 58
Case 16-655, Document 141-1, 07/31/2017, 2089420, Page2 of 19

Davino Watson, a United States citizen, was improperly held in immigration detention for more than three years because the government mistakenly believed that he was a deportable alien.  He sued under the Federal Tort Claims Act in the United States District Court for the Eastern District of New York (Weinstein, J.), asserting four claims: (1) false imprisonment, (2) malicious prosecution, (3) negligent investigation into his citizenship status, and (4) negligent failure to issue a certificate of citizenship until years after his release.  The district court found the government liable to Watson on the false imprisonment claim, dismissed the malicious prosecution claim and negligent investigation claim on motion, and entered judgment for the government on the negligent delay claim post-trial.

We reverse the judgment with respect to the false imprisonment claim, which is time-barred.  We affirm the judgment in all other respects.  The malicious prosecution claim fails because the government did not act with malice, the negligent investigation claim fails for lack of a private analogue, and the negligent delay claim fails because Watson suffered no cognizable damages.

Chief Judge Katzmann concurs in part and dissents in part in a separate opinion.

> MARK A. FLESSNER (Robert J. Burns on the brief), Holland & Knight LLP, Chicago, IL, for Plaintiff-Appellant-Cross-Appellee Davino Watson.
>
> JOSEPH A. MARUTOLLO (Varuni Nelson, James R. Cho, and Elliot M. Schachner on the brief), for Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Defendant-Appellee-Cross-Appellant United States of America.

Trina Realmuto, National Immigration
Project of the National Lawyers Guild,
Boston, MA; Mary Kenney, American
Immigration Council, Washington, DC, for
amici curiae National Immigration Project
of the National Lawyers Guild; American
Immigration Council, in support of Davino
Watson.

JACOBS, Circuit Judge:

Davino Watson, a United States citizen, was held in immigration custody
for three-and-a-half years on the mistaken belief that he was a deportable alien.
He sued under the Federal Tort Claims Act (the "FTCA") in the United States
District Court for the Eastern District of New York (Weinstein, J.), asserting false
imprisonment, malicious prosecution, and two negligence claims. One
negligence claim is that immigration officials conducted a negligent investigation
into Watson's citizenship status; the other is that the government negligently
failed to deliver a certificate of citizenship to Watson in a timely manner.[1]

After a bench trial, the district court found the government liable on the
false imprisonment claim, though the district court limited damages to the first
twenty-seven days of Watson's detention. The district court had previously
dismissed on motion the malicious prosecution claim as barred by 28 U.S.C.
§ 2680(h), as well as the negligent investigation claim for want of a state-law
analogue. After trial, the district court entered judgment against Watson on his
claim that the government negligently delayed delivery of his certificate of
citizenship, concluding that Watson had not demonstrated negligence and had
suffered no damages.

---

[1] Watson also brought two claims pursuant to <u>Bivens v. Six Unknown Named
Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), which the district
court dismissed. Watson does not challenge that ruling on appeal.

3

**ADD-4**

Watson appeals the adverse rulings on his malicious prosecution claim and both negligence claims, and also appeals the district court's decision to limit the government's damages on the false imprisonment claim. The government cross-appeals the district court's judgment on the false imprisonment claim, contending that the claim is time-barred by the FTCA's two-year statute of limitations.

It is arresting and disturbing that an American citizen was detained for years in immigration proceedings while facing deportation, but Watson's claims for damages are foreclosed by precedent. Watson's false imprisonment claim is untimely, and we reverse the judgment to that extent. We otherwise affirm. Watson's malicious prosecution claim fails because no government official acted with malice; his negligent investigation claim fails because there is no analogous tort under New York law, as required by the FTCA; and his claim that the government negligently delayed delivery of his certificate of citizenship fails because Watson did not suffer cognizable damages.

In sum, we reverse the judgment of the district court on the false imprisonment claim, affirm the judgment in all other respects, and dismiss as moot Watson's appeal from the limitation on damages for false imprisonment.

**I**

At the time of his birth in Jamaica, neither of Watson's parents were U.S. citizens. When Watson was thirteen years old in 1998, he entered the United States as a lawful permanent resident to live with his father, who was then a lawful permanent resident of the United States. Watson's father was naturalized on September 17, 2002, and there is no longer any dispute that Watson automatically became a U.S. citizen at the same time as his father. However, for most of the relevant period, the government had reason to believe that Watson was not a U.S. citizen. As will be shown, that misunderstanding resulted in part from the fact that Watson's father (Hopeton Ulando Watson) and his mother (Dorette McFarlane) never married. The relevant statutes governing Watson's citizenship status are set out in the margin.[2]

_____

[2]    A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been

4

**ADD-5**

**A**

In 2007, Watson pleaded guilty in New York state court to selling cocaine. While serving his prison sentence, Immigration and Customs Enforcement ("ICE") agents investigated Watson's citizenship status to determine whether he was deportable.

The investigation was beset by errors. From the beginning, ICE agents were presented with information strongly suggesting that Watson was a citizen based on his father's naturalization, but the agents did not competently pursue the leads. For example, during Watson's first interview with ICE, he claimed U.S. citizenship, told the ICE agents the names of his father and step-mother, and gave their telephone number to assist the investigation. The ICE agents did not call the telephone number, despite writing a note to do so in order "to verify

---

fulfilled:

> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.

> (2) The child is under the age of eighteen years.

> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a). For purposes of that provision, "child" is defined as:

> an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, . . . if such legitimation . . . takes place before the child reaches the age of 16 years . . . and the child is in the legal custody of the legitimating . . . parent . . . at the time of such legitimation . . . .

8 U.S.C. § 1101(c)(1).

status." App'x at 206, 500.  There may be reason to suspect a proffered phone number, but the call was never made, even though Watson's pre-sentencing report, a copy of which ICE received,  indicated that he was a U.S. citizen, listed the names of his father and step-mother, and gave the same phone number that Watson had provided.

Although they did not call his father and step-mother, ICE agents did attempt to learn more about them as part of the investigation into Watson's citizenship.  Importantly, Watson's father's name is "Hopeton *Ulando* Watson" and his step-mother's name is "*Clare* Watson."[3]  When ICE agents searched an ICE database for "Hopeton Watson" and "Clare Watson," they found a "Hopeton *Livingston* Watson" and a "*Calrie* Watson."  Because these two persons were born in Jamaica and lived near New York, ICE agents assumed that they were Watson's parents.

The agents might be forgiven for making that assumption: "Hopeton" might seem like an unusual name, and "Calrie" is within a typo of "Clare."  But the ICE agents also ignored or failed to recognize flags that these people were not related to Watson.  Aside from the fact that Hopeton Livingston Watson had the wrong middle name, his file also reflected that he lived in Connecticut (rather than New York), did not have a child named Davino, and became a lawful permanent resident three years *after* the date of Davino Watson's lawful permanent residency.  Evidently, the ICE officers also failed to look at the affidavit that Watson's actual father (Hopeton Ulando Watson) had submitted in connection with Davino's application for legal permanent residency in 1998.  That affidavit contained Hopeton Ulando Watson's date of birth, alien number, and social security number, none of which matched the corresponding file data for Hopeton Livingston Watson.

Nonetheless, the government assumed that Hopeton Livingston Watson was Davino's father.  And since Hopeton Livingston Watson was not a citizen, ICE agents believed that Watson similarly lacked citizenship and was subject to deportation.

---

[3] When ICE agents asked Watson for his mother's name, he apparently gave them the name of his step-mother.

Case 16-655, Document 149, 09/13/2017, 2123503, Page28 of 58
Case 16-655, Document 141-1, 07/31/2017, 2089420, Page7 of 19

A supervisory ICE officer, relying on this conclusion without undertaking more investigation, drafted a "Notice to Appear," which initiates deportation proceedings. In the words of the district court, another supervisory officer "mindlessly signed" the Notice to Appear and forwarded it to the ICE office responsible for taking Watson into custody.

### B

After Watson completed his state prison sentence, he was arrested by ICE agents, and placed in custody despite Watson's insistence that he was a citizen. Watson's Notice to Appear was formally filed nineteen days later, and he first appeared before an immigration judge about one month afterward.

### C

Watson actively sought to prove his citizenship throughout his immigration detention. Early on, he applied to the United States Citizenship and Immigration Services ("USCIS") for a certificate of citizenship (a document that evidences the bearer's U.S. citizenship). USCIS denied his request on the basis of In re Hines, 24 I. & N. Dec. 544 (BIA 2008), decided by the Board of Immigration Appeals ("BIA") twenty-eight days after Watson was detained.

Hines dealt with the requisites of "legitimation" under Jamaican law. That issue was critical to Watson because he could derive citizenship from his father only if he had been "legitimated" by his father. See 8 U.S.C. §§ 1101(c)(1), 1431(a). In Hines, the BIA stated that it "will deem a child born out of wedlock in Jamaica to have had his or her paternity established 'by legitimation' only upon proof that the child's parents married at some time after the child's birth." 24 I. & N. Dec. at 548. Because Watson's parents never married, he was not deemed to have been "legitimated," and consequently was ineligible for derivative citizenship under the BIA's then-current interpretation of Jamaican law. Ultimately, Hines led to the denial of Watson's application for a certificate of citizenship by USCIS, the issuance of an order of removal by the immigration judge, and the affirmance of Watson's order of removal by the BIA.

ADD-8

Case 16-655, Document 149, 09/13/2017, 2123503, Page29 of 58
Case 16-655, Document 141-1, 07/31/2017, 2089420, Page8 of 19

## D

In a prior appeal, Watson petitioned this Court to review the immigration judge's order of removal.  We denied his petition, but in so doing we declined to consider whether the BIA correctly concluded that Watson had not been "legitimated;" rather, we relied on the BIA's alternative ruling that Watson had not produced evidence showing that his father had legal custody over him, which would preclude derivative citizenship regardless of legitimation.  See 8 U.S.C. § 1431(a)(3).  However, after Watson filed an emergency petition in this Court, we recalled our mandate and reinstated Watson's original petition.  We then asked the BIA to clarify and justify its "legitimation" analysis.  Watson v. Holder, 643 F.3d 367 (2d Cir. 2011) (per curiam).

After our remand, ICE apparently began to suspect that Hines might not apply to Watson, and that Watson might be a U.S. citizen under the BIA's pre-Hines precedent.  The government's precise views on the application of Hines to Watson's case are somewhat obscure.[4]  In any event, ICE released Watson in November 2011 into rural Alabama (where he knew nobody), without money,

---

[4]  Shortly before Watson was released from custody, an ICE memo suggested that Hines should not be applied retroactively.  If so, Watson would be a citizen because, under the pre-Hines precedent In re Clahar, 18 I. & N. Dec. 1 (BIA 1981), Watson would have been deemed legitimate pursuant to the BIA's interpretation of Jamaican law.  App'x at 402-03.  The BIA did not appear to rely on that reasoning when it formally terminated Watson's removal proceedings more than a year later.  Instead, the BIA's unpublished opinion reasoned that Hines dealt with the statutory phrase "paternity by legitimation," and thus did not implicate the statutory term "legitimated," which was the relevant term in Watson's case.  App'x at 457; see also 8 U.S.C. § 1432(a)(3) (2000), repealed by Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103, 114 Stat. 1632-33.  In any event, the government conceded that Watson had been "legitimated" under Jamaican law, and the BIA concluded that Watson consequently "derived citizenship through his father's naturalization."  App'x at 457.  The BIA's shifting interpretations of Jamaican law did not end, however: it has since overruled Hines in its entirety, returning to the interpretation first expressed in Clahar.  See In re Cross, 26 I. & N. Dec. 485, 485-86 (BIA 2015).

and without being told the reason for his release. Removal proceedings technically continued for more than a year, ending at last when the BIA, responding to this Court's remand, issued an unpublished decision concluding that Hines did *not* apply to Watson's case. The BIA determined that Watson "was legitimated" under Jamaican law, deduced that Watson "derived citizenship through his father's naturalization," and accordingly terminated Watson's removal proceedings. App'x at 457.

Watson later moved to reopen his application for a certificate of citizenship, which he received after a long delay. The certificate states that Watson has been a citizen since the date of his father's naturalization.

### E

Watson filed an administrative claim for damages with DHS on October 30, 2013, which was denied approximately one year later. He initiated this lawsuit in the Eastern District of New York on October 31, 2014.

### II

The district court found the government liable to Watson on his claim of false imprisonment. The government's argument that the claim was untimely was rejected on alternative grounds. First, the court ruled that the statute of limitations for the false imprisonment did not begin to run until the day Watson received his certificate of citizenship (November 26, 2013). Second, even if Watson's claims were filed after the limitations period had expired, the district court ruled that Watson would be entitled to equitable tolling until the day that Watson was informed by his lawyer of his right to bring an FTCA claim (July 31, 2014). Since both events post-dated the filing of Watson's administrative claim, the false imprisonment claim would be timely.

We disagree. Watson's false imprisonment claim is untimely, and the judgment of the district court is reversed to the extent it held the government liable on Watson's false imprisonment claim.

### A

Watson brought his claim pursuant to the FTCA, which imposes a two-year statute of limitations:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . .

28 U.S.C. § 2401(b).  Since Watson's administrative claim for false imprisonment was filed on October 30, 2013, it is untimely if it accrued before October 30, 2011.  The question, then, is when Watson's claim accrued.[5]

 The district court (erroneously) held that this question was governed by Heck v. Humphrey, 512 U.S. 477 (1994).[6]  But Watson concedes on appeal (and we agree) that the proper framework is provided by Wallace v. Kato, 549 U.S. 384 (2007).  Wallace held that  "[l]imitations begin to run against an action for false imprisonment when the alleged false imprisonment ends."  Id. at 389 (quoting 2 H. Wood, Limitations of Actions § 187d(4), p. 878 (rev. 4th ed. 1916)).  It is of

---

[5] The district court's denial of the government's motion for summary judgment based on the claim's accrual date is reviewed de novo.  See Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1492 (2d Cir. 1995).

[6] In Heck, the Supreme Court held that a prisoner cannot bring a claim against the government "for allegedly unconstitutional conviction or imprisonment" unless the plaintiff can prove that the "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Id. at 486-87.  In light of that ruling, the Supreme Court further held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."  Id. at 489-90.  Analogizing to Heck, the district court determined that Watson's false imprisonment claim did not accrue until he received his certificate of citizenship on November 26, 2013.

course possible for the tort of "false imprisonment" to end while physical detention continues. That is so because of the distinction between the tort of false imprisonment and the tort of malicious prosecution: false imprisonment is characterized by "detention *without legal process*," while malicious prosecution involves detention resulting from "*wrongful institution* of legal process." Id. at 389-90 (emphases in original). "[F]alse imprisonment ends once the victim becomes held *pursuant to such process*--when, for example, he is bound over by a magistrate or arraigned on charges." Id. at 389 (emphasis in original). "Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution." Id. at 390 (quoting W. Keeton et al., Prosser & Keeton on Law of Torts § 119, p. 885-86 (5th ed. 1984)). In short, a false imprisonment claim starts to run when a detainee begins to be held pursuant to legal process.

The timeliness of Watson's claim therefore depends on when he began to be held pursuant to legal process. There are several potential dates, including the day Watson was served with a "Notice to Appear" (which starts removal proceedings), and the day Watson first appeared before an immigration judge.

But we need not decide the precise date on which Watson was first held pursuant to legal process because we conclude that Watson was certainly held pursuant to such process by the time an immigration judge ordered Watson's removal, which occurred on November 13, 2008.[7] By that point, Watson and the government had filed opposing briefs on removability, and the immigration judge weighed the arguments and ruled against Watson, thereby affirming the government's right to detain him. The Supreme Court has indicated that a cause of action for false imprisonment begins at least by the point a criminal defendant is arraigned on charges, see Wallace, 549 U.S. at 391, and by November 13, 2008, Watson had gone through an entire trial-like proceeding to determine the

---

[7] It bears emphasis that legal process may attach prior to an immigration judge's determination of removability.

lawfulness of his detention.  Because that date occurred more than two years before Watson filed his administrative claim, his cause of action is untimely.[8]

**B**

Alternatively, the district court ruled that Watson's claims were timely on the ground of equitable tolling.  In these circumstances, we review the district court's decision to allow equitable tolling for abuse of discretion.  See Phillips v. Generations Family Health Ctr., 723 F.3d 144, 149 (2d Cir. 2013).

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Mottahedeh v. United States, 794 F.3d 347, 352 (2d Cir. 2015) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  In this appeal, the second element is decisive.

Watson's case is certainly extraordinary in a number of unfortunate ways.  However, "[t]he term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period."  Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011).  So: "[t]o secure equitable tolling, it is not enough for a party to show that he *experienced* extraordinary circumstances.  He must further demonstrate that those circumstances *caused* him to miss the original filing deadline."  Id. (emphasis added).

---

[8] Watson also contends that, since he was a U.S. citizen, he was not subject to "legal process" because immigration judges lack jurisdiction to conduct removal proceedings against U.S. citizens.  He cites Ng Fung Ho v. White, 259 U.S. 276, 284 (1922): "Jurisdiction in the executive to order deportation exists only if the person arrested is an alien.  The claim of citizenship is thus a denial of an essential jurisdictional fact."  Nevertheless, an immigration judge has jurisdiction to *consider* a person's claim to citizenship when the government alleges the person is an alien; and such jurisdiction is sufficient to allow legal process to begin.

The district court's grant of equitable tolling was based on Watson's lack of education and legal training, his unawareness that he could bring an FTCA claim until being advised by appointed counsel, his depression, and "most significantly," the fact that government officials told Watson that he was not a U.S. citizen. App'x at 181-82. None of those reasons justifies equitable tolling.

We begin with the circumstance emphasized by the district court (and by Watson on appeal), that "the government actively and repeatedly insisted . . . that he was not a citizen, which made it more difficult for Watson to recognize his FTCA cause of action." Watson's Reply Br. at 35. But making it "more difficult" for Watson to assert his false imprisonment claim is insufficient. Rather, Watson must demonstrate that the government's assertion of his alien status was a sufficiently "severe" obstacle that "caused" him to miss his filing deadline. Harper, 648 F.3d at 137.

Watson's own actions foreclose the argument. He mounted a vigorous case in the immigration court in the effort to prevent deportation: he obtained copies of important documents supporting his claim to citizenship, presented those documents to the immigration judge and other officials, filed a pro se motion to terminate his removal proceedings, and responded to the government's brief in opposition. During his detention, Watson also applied to USCIS for a certificate of citizenship, proffering documents in support of his claim of derivative citizenship.

The government's assertion of Watson's alienage could not have been so disheartening as to preclude him from filing an administrative claim for damages while (at the same time) it did not inhibit him from contesting his citizenship in an immigration proceeding based on identical facts. The government's position therefore did not "cause[] him to miss the original filing deadline" for his administrative claim. Harper, 648 F.3d at 137.

It is harsh to place the burden on Watson to file a claim for damages while he is in immigration detention and fighting to prevent his deportation. But the Supreme Court has stated: "We know of no support . . . for the far-reaching proposition that equitable tolling is appropriate to avoid the risk of concurrent

litigation."  Wallace, 549 U.S. at 396.  The facts of Wallace are demonstrative.
Arrested by Chicago police in 1994, Wallace confessed to murder while in police
custody.  Id. at 386.  Years later, Illinois state appellate courts vacated the
conviction because Wallace had been arrested without probable cause.
Prosecutors dropped charges in 2002, and a year later Wallace filed a § 1983 suit
seeking damages for false imprisonment.  Id. at 387.  The Supreme Court held
that the claim for false imprisonment accrued when Wallace appeared before a
magistrate, and because that occurred (many) more than two years before he
filed suit, his claim was untimely.[9]  Id. at 391-92.  Equitable tolling was rejected
notwithstanding that Wallace was either awaiting trial or was imprisoned
pursuant to a then-valid conviction throughout that two-year period.  Id. at 396-
97.  Equitable tolling was not warranted even though a district court would have
stayed or dismissed Wallace's suit pursuant to Heck if Wallace had filed his tort
claim before his conviction had been overturned.  Id. at 396-97.  In light of
Wallace, we cannot justify the grant of equitable tolling to Watson on the ground
that he was (however understandably) focused on avoiding deportation before
filing his claim for administrative damages.

Watson's depression cannot justify equitable tolling for similar reasons.
Depression did not prevent him from contesting his citizenship before the
immigration judge, so it could not have prevented him from filing his
administrative claim for damages.

Nor can equitable tolling be premised on Watson's lack of education, pro
se status, or ignorance of the right to bring a claim.  See, e.g., Menominee Indian
Tribe v. United States, 136 S. Ct. 750, 756-57 (2016) (tribe's mistake of law did not
constitute extraordinary circumstance sufficient to justify equitable tolling);
Smith v. McGinnis, 208 F.3d 13, 18 (2d Cir. 2000) (habeas petitioner's "pro se
status . . . does not merit equitable tolling").  "Equitable tolling is a rare remedy to

---

[9] The Supreme Court did allow tolling for the time period that Wallace was a
minor.  Wallace, 549 U.S. at 390.  Such tolling is distinct from equitable tolling,
and has no application to this case.

be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."[10]  Wallace, 549 U.S. at 396.

In sum, Watson's false imprisonment claim was untimely and cannot be saved by equitable tolling.  We therefore grant the cross-appeal of the United States on this issue and reverse the judgment of the district court with respect to the government's liability on Watson's false imprisonment claim.

### III

The district court dismissed Watson's malicious prosecution claim on motion, concluding that the cause of action was foreclosed by 28 U.S.C. § 2680(h), which bars FTCA claims that arise out of malicious prosecution unless certain exceptions apply.  App'x at 135.  One such exception is a claim for malicious prosecution "with regard to acts or omissions of investigative or law enforcement officers of the United States government."  28 U.S.C. § 2680(h).  Watson argues that the district court failed to recognize that his malicious prosecution claim was based on acts and omissions by ICE and DHS officers, who (Watson contends) are "investigative or law enforcement officers" within the meaning of § 2680(h).  Though Watson is correct on this point, see Liranzo v. United States, 690 F.3d 78, 91 (2d Cir. 2012), the district court's factual findings are fatal to his claim.

To recover under the FTCA, a plaintiff must show that a government employee committed a tort "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); see also 28

---

[10] The dissent thrice adverts to this quoted passage, drawing the invalid inference that the majority deems the multi-year detention of an American citizen as an "entirely common state of affairs."  Dissent at 1, 15, 18.  What is "an entirely common sate of affairs" is Watson's 11th-grade education and the corollary that he lacks knowledge of the law.  The dissent would rely on those characteristics to toll the limitations period.  But those characteristics, commonplace for pro se litigants (and for a substantial segment of the population), are wholly insufficient to justify the "rare remedy" of equitable tolling.  Wallace, 549 U.S. at 396.

U.S.C. § 2674.  The parties agree that New York law applies to this appeal.  In New York, the elements of malicious prosecution are: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice."  Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).

As the New York Court of Appeals has recently reaffirmed, the tort of malicious prosecution requires proof of both malice and a lack of probable cause, which are "independent and indispensable elements."  Torres v. Jones, 26 N.Y.3d 742, 761 (2016) (quoting Martin v. City of Albany, 42 N.Y.2d 13, 17 (1977)).  To prove malice, a plaintiff must show that the defendant acted in bad faith, i.e., on the basis of "a wrong or improper motive, something other than a desire to see the ends of justice served."  Id. (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 503 (1978)).  After a bench trial on liability with respect to the claims that survived dismissal, the district court found that Watson's "harm was caused by a series of negligent acts by government officials," and that "[t]here is no evidence of malice or intent to harm plaintiff."  App'x at 226.  Because Watson cannot demonstrate malice under New York law, his malicious prosecution claim fails.

### IV

Watson asserts two distinct claims of negligence.  The first claim is that ICE agents negligently failed to comply with internal regulations for how to investigate a suspected alien's assertion of U.S. citizenship.  The district court dismissed, reasoning that Watson was essentially arguing that ICE agents conducted a "negligent investigation," which is not actionable under New York tort law.  We review that decision de novo.  Fountain v. Karim, 838 F.3d 129, 134 (2d Cir. 2016).

Under the FTCA's private analogue requirement, see 28 U.S.C. § 1346(b)(1), "a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred."  McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016) (internal quotation marks omitted).  And "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).

Watson concedes that there is no New York tort of negligent investigation, but contends that he is asserting the distinct claim that Watson's injury was caused by the failure of ICE to follow its own internal directives.  A similar re-characterization was attempted in McGowan; like the plaintiff in McGowan, Watson has "failed to establish that New York law recognizes a freestanding duty to abide by private regulations."  825 F.3d at 127.  Although failure to abide by internal regulations may "constitute[] *evidence* of negligence," it does not demonstrate "negligence in itself."  Id. (emphasis in original).  Because New York does not recognize a duty to follow private regulations, Watson cannot ground his negligence claim on ICE's failure to follow its own directives regarding how to pursue an investigation into a subject's citizenship.[11]

This negligence claim consequently fails for lack of a private analogue, and we affirm the district court's dismissal of that claim.

**V**

Watson asserts that USCIS negligently delayed providing him with his certificate of citizenship for more than two years after he was released from custody.  After a bench trial, the district court entered judgment for the government for two independent reasons.  First, Watson failed to demonstrate that the government acted negligently.  Second, "[e]ven if a duty of care was violated . . . , plaintiff failed to satisfy his burden of establishing damages caused by the breach."  App'x at 231.

Specifically, with respect to damages, the district court found that Watson's "inability to secure work was a result of his criminal history, drug use, and general lassitude, not his immigration status," and that there is "no credible evidence that plaintiff's post-release depression was caused by the government's failure to provide a certificate of citizenship earlier than it did."  Id.  Without

---

[11] Watson also contends that this negligence claim is partially based on the government's "failure to act."  Watson's Reply Br. at 24.  But the "failure to act" that Watson alleges is simply a failure to conduct a non-negligent investigation.  New York law does not recognize such a tort.  <u>Bernard</u>, 25 F.3d at 102.

**ADD-18**

challenging those findings, Watson argues that the district court found that Watson *had* suffered *other* cognizable harm as a result of his delay in receiving his certificate of citizenship.

Watson evidently relies on the district court's "Alternative Damages Award," in which the district court provided for conditional damages "in the event that the Court of Appeals concludes th[e] [district] court erred in limiting damages to . . . false imprisonment." App'x at 242. With respect to Watson's claim for negligent delay of his certificate of citizenship, the Alternative Damages Award stated that: "*If* plaintiff is entitled to damages for the period between his release from ICE custody and his receipt of a certificate of citizenship, he would be entitled to $1,000 per day for what amounts to a constructive limitation on his liberty, and an additional $250 per day for the emotional injury caused by the government's failure to timely provide the certificate." Id. (emphasis added). Watson contends that this passage is an implicit finding that Watson did suffer cognizable damage as a result of the delayed delivery of the certificate, of a nature (emotional damages and a constructive limitation on liberty) distinct from the damages the district court found unavailable in its primary finding on damages (i.e., that Watson could not show damages for depression or lost income).

We disagree with Watson's reading of the district court's order. The district court was quite clear that Watson's failure to demonstrate damages was a *complete* bar to recovery on his negligent delay claim: "[e]ven if a duty of care was violated by the time it took to issue a certificate of citizenship, plaintiff failed to satisfy his burden of establishing damages caused by the breach." App'x at 231. The district court ordered damages to be awarded in the alternative only if we disagree with the district court's threshold conclusion that Watson had failed to prove damages; we do not.

Accordingly, we affirm the district court's determination with respect to Watson's second negligence claim.[12]

---

[12] In light of our disposition, we have no need to consider the district court's conclusion that Watson's negligence claim was sufficiently analogous to a claim

**ADD-19**

## CONCLUSION

In sum, there is no doubt that the government botched the investigation into Watson's assertion of citizenship, and that as a result a U.S. citizen was held for years in immigration detention and was nearly deported. Nonetheless, we must conclude that Watson is not entitled to damages from the government. His false imprisonment claim was untimely, his malicious prosecution claim does not demonstrate malice, his "negligent investigation" claim fails for lack of a proper analogue in state law, and his claim for negligent delivery of a certificate of citizenship fails because Watson could not show cognizable damages.

Accordingly, the judgment of the district court is reversed on the false imprisonment claim and affirmed in all other respects. Watson's appeal regarding the amount of damages for false imprisonment is dismissed as moot.

---

recognized by New York tort law to survive the FTCA's private analogue requirement.

KATZMANN, *Chief Judge*, concurring in part and dissenting in part:

It is well known that immigrants in this country "have no specific right to counsel" in immigration proceedings, even for life-altering proceedings such as detention and removal. *Aris v. Mukasey*, 517 F.3d 595, 600 (2d Cir. 2008) (internal quotation marks omitted). What is less well known, but no less consequential, is that *U.S. citizens* also have no such right if they are ensnared in our nation's detention and removal system, and yet they bear the burden of establishing their citizenship in order to secure release. This case is a striking illustration of the consequences that stem from the government's broad discretion to initiate detention and removal proceedings, coupled with the sometimes limited ability even a U.S. citizen has to assert a valid claim of citizenship in the absence of the assistance of counsel.

While I join the majority's disposition of Watson's malicious prosecution and negligence claims, I do not join the other aspects of the decision, for two principal reasons. First, I do not share the majority's confidence that, for the purposes of Watson's false imprisonment claim, "Watson was certainly held pursuant to [legal] process" by no later than November 13, 2008. Maj. Op. at 11. Second, I do not find that, after a thorough bench trial and detailed findings of fact, the district court abused its direction in concluding that equitable tolling was warranted. I cannot agree with the inference that the conditions surrounding Watson's wholly unjustified 1,273-day detention were an "entirely common state of affairs." Maj. Op. at 22 (quoting *Wallace v. Kato*, 549 U.S. 384, 396 (2007)). To the best of my knowledge, this is the first time this Circuit has *ever* reversed a district court's decision to grant equitable tolling in such a fashion, and I simply do not think such a reversal is warranted in light of the circumstances of Watson's detention. For the reasons that follow, I respectfully dissent as to these issues.

## I.  The Government's Negligent Detention of Watson

Prior to acknowledging in a "revised memorandum" in November 2011 what the government should have recognized from the start — that Watson has

1

been a U.S. citizen since 2002 — the government had detained Watson for 1,273 days. *Watson v. United States*, 133 F. Supp. 3d 502, 518 (E.D.N.Y. 2015) [hereinafter *Watson I*]. I do not share the majority's view that the government's mistake "resulted in part from the fact that Watson's father (Hopeton Ulando Watson) and his mother (Dorrette McFarlane) never married," Maj. Op. at 4, because regardless of his parent's marital status, Watson's derivative citizenship claim, if properly investigated, would have been easily verified. Instead, as the district court explained in its post-trial findings, Watson's "wrongful" detention resulted from the government's "negligent failure to properly investigate plaintiff['] s claim of citizenship" and from the "grossly negligent" "[r]epeated and routine approval of the initial investigation by public officials without checking the facts." *Watson v. United States*, No. 14-CV-6459, 2015 WL 7281637, at *1 (E.D.N.Y. Nov. 16, 2015) [hereinafter *Watson II*]. These errors, which occurred prior to Watson's detention, were then compounded during Watson's removal proceedings by the misapplication of relevant case law by government lawyers, the immigration judge ("IJ"), and even the BIA, which was only brought to light once Watson's case finally reached our Court and we assigned him pro bono counsel. I thus share the trial court's cogent view that "[i]f plaintiff had counsel upon his initial detention, it is likely that he would promptly have been found to be a United States citizen and released." *Watson v. United States*, No. 14-CV-6459, 2015 WL 7281638, at *1 (E.D.N.Y. Nov. 17, 2015) [hereinafter *Watson III*].

It is worth reflecting on the "grossly negligent" government actions that led to Watson's three-and-a-half-year detention. *Watson II*, 2015 WL 7281637, at *1. Early in ICE Deportation Officer Erik Andren's investigation into Watson's citizenship status and eligibility for removal, Andren interviewed Watson "at New York's Downstate Correctional Facility where plaintiff was incarcerated." *Watson v. United States*, 179 F. Supp. 3d 251, 262 (E.D.N.Y. 2016) [hereinafter *Watson IV*]. Watson told Officer Andren that he was a U.S. citizen and provided the names and phone number of his father and step-mother, who could verify his citizenship status. Prior to that interview, Officer Andren had received a packet of information from the New York State Department of Correctional Services that included a "New York City Department of Probation Pre-Sentence Investigation Face Sheet." App. 254. That document corroborated the names and phone

2

number of Watson's father and step-mother, and it clearly indicated that Watson was a U.S. citizen.

From the earliest stages of the investigation, then, there were clear indications that Watson was a citizen and therefore ineligible for removal. Yet Andren appears to have made almost no effort to verify Watson's claim of derivative citizenship. At trial, when asked if he ever contacted Watson's parents, Andren answered, "I don't recall calling them," App. 500, and the trial evidence indicated that he never successfully reached anyone at Watson's parents' phone number. Andren also introduced *errors* into the report he produced, pulling the alien files ostensibly for Watson's father and step-mother — Hopeton Ulando Watson and Clare Watson — but actually requesting the alien files of two entirely unrelated individuals *with different names*, Hopeton *Livingston* Watson and *Calrie Dale* Watson. As the district court succinctly noted after its bench trial,

> A reasonable person exercising even a modest amount of care would have recognized that these files did not—could not—belong to plaintiff's father or step-mother. The file for Hopeton Livingston Watson indicated that he lived in Connecticut and was not married; plaintiff told Officer Andren that his father lived in New York and was married. It also indicated that Hopeton Livingston Watson became a permanent resident of the United States on April 14, 2001, three years after plaintiff came to the United States as a permanent resident. And none of the children listed just a few pages into the file were named Davino Watson, or were listed as living in the United States. Each of these facts should have indicated that this was not the correct file. . . . It is obvious that the file for Calrie Dale Watson is not the correct file. In addition to the incorrect first name, this file shows that Calrie Dale Watson was married to a Gabriel Miller, not Hopeton Watson. The file indicates that the Watson name came from this individual's first husband, Rowan Eric Watson, who died in 1983.

*Watson IV*, 179 F. Supp. 3d at 263 (citation omitted). In short, rather than contact Watson's parents to ascertain plaintiff's naturalization history, Officer Andren ordered the incorrect alien files for Watson's parents, and to compound this error, "[n]either Officer Andren—who did not even wait for the files to arrive before making his decision—nor any other ICE official took reasonable steps to investigate plaintiff's well founded claim of United States citizenship." *Id.* The report Andren produced misidentified Watson's parents (and introduced a *new* error by referring to Watson's step-mother as "Claire" rather than either "Calrie" or, correctly, "Clare"), omitted their address and phone number, and stated that Watson was "a national and citizen of Jamaica" and that neither he nor his parents were U.S. citizens. App. 260.

Andren's report was passed on to his superior, Officer Juan Estrada, who conducted no independent investigation of his own and relied only on Officer Andren's report and the incorrect alien files to produce charging documents indicating that Watson's "parents are nationals and citizens of Jamaica who have not naturalized," so "[n]o issue of derivation applies," a conclusion which the trial court found "was flatly wrong." *Watson IV*, 179 F. Supp. 3d at 264 (emphasis omitted). An ICE attorney then reviewed the charging documents to confirm legal sufficiency to initiate removal proceedings without pursuing any independent verification of their accuracy, an action the district court labeled a "level of review [that] was effectively a mindless failure." *Id.* Finally, ICE Supervisory Deportation Officer Michael Ortiz "merely signed off on the obvious errors already committed," "a shirking of duty." *Id.* at 264–65.

As a result of this "grossly negligent" investigation, *Watson II*, 2015 WL 7281637, at *1, Watson was promptly taken into ICE custody upon his release from state prison on May 8, 2008. He was told at that time by the ICE officers who arrested him that the government had reason to believe that Watson was an alien eligible for removal as a result of his criminal convictions. Watson challenged their assertion, informing them that he was in fact a U.S. citizen, but ICE officers responded that Watson would appear before an immigration judge within 24 hours and could raise the issue then. Despite this representation, Watson ultimately did not appear before an IJ until June 25, 2008. Rather

incredibly, then, the government detained a U.S. citizen *for 48 days* before he even had the first opportunity to appear before a judicial officer to contest the basis for his detention. Despite Watson's immediate assertion that he was a citizen, no one from ICE ever circled back to interview Watson or reopen his file to determine if the government had made a mistake.

In addition to the ICE officers' negligence in initiating removal proceedings, the government also committed errors in asserting the ongoing legal basis for removal. At the time that Watson's father became a naturalized U.S. citizen in 2002, the BIA's interpretation of Jamaican legitimation law was governed by *Matter of Clahar*, 18 I. & N. Dec. 1 (B.I.A. 1981), which, as applied to Watson, meant that Watson — then a minor — immediately acquired derivative U.S. citizenship at the time of his father's naturalization. On June 4, 2008, however, the BIA decided *Matter of Hines*, 24 I. & N. Dec. 544 (B.I.A. 2008), which revised the BIA's interpretation of Jamaican legitimation law to such effect that, if applied to an individual similarly situated to Watson, that individual would *not* obtain derivative citizenship upon the naturalization of his/her father. Although Watson contended he had obtained derivative citizenship in 2002 — long before *Hines* was decided — the government's legal position after June 4, 2008, was that under *Hines*'s interpretation of Jamaican legitimation law, Watson had always been ineligible for derivative citizenship. The IJ's November 13, 2008, oral decision finding that Watson was not a citizen also relied on *Hines* as the basis for the ruling, rejecting any applicability of *Matter of Clahar*.

This conclusion of law is patently incorrect, because courts must "apply the law in effect when [an alien] fulfilled the last requirement for derivative citizenship," *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005), which in Watson's case was his father's naturalization in 2002. As explained above, *Matter of Clahar* was indisputably the law in effect at that time. Indeed, applying the "law in effect when the last material condition [of derivative citizenship] is met" has been *the BIA's* own longstanding rule. *In Re Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 163 (B.I.A. 2001) (citing *Matter of L—*, 7 I. & N. Dec. 512, 513 (B.I.A. 1957)). This is because "derivative citizenship is automatic; that is, when certain conditions exist, a child becomes a U.S. citizen even though neither parent, nor the child, has

requested it and regardless of whether any of them actually desires it." *Lewis v. Gonzales*, 481 F.3d 125, 131 (2d Cir. 2007) (per curiam); *see also* 8 U.S.C. § 1431. As a result, if an immigration judge is later charged with determining an alien's derivative citizenship status, the IJ must apply the law in effect at the time the last material condition for obtaining such citizenship was satisfied, even if, as of the date of adjudication, that law is no longer valid.[1] Had the government not urged an obviously incorrect legal justification for Watson's detention, or had the IJ caught the government's error and properly followed the law at Watson's November 13, 2008, removal hearing, Watson would have been spared an additional three years in detention.

## II. "Legal Process" in Immigration Detention and Removal Contexts

Turning now to Watson's intentional tort claims, while I agree with the majority that the district court's false imprisonment analysis was incorrect as a matter of law, I cannot join the majority's approach either. As an initial matter, we have never applied *Wallace*'s "legal process" test for distinguishing a false imprisonment claim from a malicious prosecution claim to immigration detention and removal, and there are reasons to doubt whether *Wallace*'s analysis, developed in response to a criminal prosecution, applies with equal measure to such proceedings. In *Wallace*, the Supreme Court highlighted the significance of "legal process" in distinguishing between a false imprisonment claim and a malicious prosecution claim in the context of a criminal prosecution,

---

[1] Even on its face, *Matter of Hines* is clearly limited only to *prospective cases*: the BIA declared that it would apply its revised understanding of Jamaican legitimation law only "in future cases," and by expressly stating that it was "now prompt[ed] . . . to overrule *Matter of Clahar*," it clarified that it would "*hereafter* deem a child born out of wedlock in Jamaica to be the 'legitimated' child of his biological father only upon proof that the petitioner was married to the child's biological mother at some point after the child's birth." *Matter of Hines*, 24 I. & N. Dec. at 548 (emphasis added). This language would seem to make clear that *Matter of Hines* did not have retroactive application, and so notwithstanding the "law in effect" rule, *Matter of Clahar* never ceased to be the controlling law as to Watson's derivative citizenship claim.

**ADD-26**

holding that because "false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process." 549 U.S. at 389 (emphasis omitted). *Wallace* emphasized that such process might be said to take place "when, for example, [a criminal defendant] is bound over by a magistrate or arraigned on charges." *Id.* Those procedures, of course, have no direct analogue in civil immigration removal proceedings, which do not trigger the panoply of rights guaranteed to criminal suspects pending trial. [2]

Critical among these rights, of course, is the right to counsel. The Supreme Court has held that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008). The Court has "pegged commencement" of the right to counsel "to the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 198 (internal quotation marks omitted). In the criminal context, then, the point at which legal process begins is the moment when a false imprisonment claim accrues, a potential malicious prosecution claim applies instead, and when the detainee is assured of the assistance of counsel.

---

[2] Another significant difference between criminal and civil removal proceedings that may counsel against *Wallace*'s applicability here is that in a criminal prosecution, the government must establish probable cause before a neutral body such as a judge or a grand jury in order to initiate a prosecution against a defendant. In the immigration context, no such independent ratification of probable cause is necessary to justify initiating removal proceedings, including detention. *See* 8 C.F.R. 239.1 (listing executive branch officers authorized to issue Notices to Appear). Nor, as Watson's experience makes abundantly clear, is there a requirement that the government establish probable cause (or something akin to it) to justify *maintaining* removal and detention pending a final decision as to removability. *See* 8 C.F.R. 1240.10.

7

The critical difference between the criminal and immigration removal proceedings is that no such assistance of counsel is ensured during the detention and removal process, which means that a detained individual — even a detained *U.S. citizen*, as Watson was — is forced to wage his legal battle against the government without the assistance of counsel if he cannot afford it. This is especially problematic in the context of removal proceedings because in the removal context, unlike the criminal context where the government must establish probable cause to initiate a prosecution, if the respondent was born overseas, "there is a presumption of alienage and the *respondent* has the burden of going forward with the evidence to establish a claim to United States citizenship." *Matter of Leyva*, 16 I. & N. Dec. 118, 119 (B.I.A. 1977) (emphasis added); *see also Gupta v. Lynch*, 661 F. App'x 737, 740 (2d Cir. 2016) ("Clear and convincing evidence that the petitioner was born abroad creates a presumption of alienage" which may be rebutted "only by proving, by 'a preponderance of the credible evidence,' that [the respondent] is a citizen notwithstanding his foreign birth."). Thus even though an immigration judge lacks jurisdiction to initiate removal proceedings against a U.S. citizen, as the majority acknowledges, *see* Maj. Op. at 12 n.8 (citing *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)), the legal burden to demonstrate citizenship, and therefore to establish a lack of jurisdiction, rests with the respondent.

The difference in legal burdens is also important when it comes to the immigration judge's decision as to removability. "A respondent charged with deportability shall be found to be removable if the [government] proves by clear and convincing evidence that the respondent is deportable as charged," 8 C.F.R. § 1240.8, an easier burden to meet than the criminal reasonable doubt standard. Yet this lesser level of proof leads to removal from the country — in Watson's case, his home from the time that he moved to the United States in 1998 at the age of 14. As the government itself acknowledges, "[t]he determination of whether a foreign-born person has derived citizenship involves complex legal and factual issues, and often requires consideration of foreign law and events that occurred outside the United States." Gov. Br. 47. U.S. citizens like Watson are often forced to go it alone in navigating these "complex legal and factual issues" involving the interpretation and application of foreign law without

8

counsel to assist them. Such respondents have limited capacity to gather evidence while detained pending removal, and are provided with little instruction into the applicable laws and doctrines, and yet have the burden of affirmatively establishing their citizenship to end removal proceedings and defeat the government's claim of deportability.

Thus even though Watson asserted his U.S. citizenship status at the very first interview with Officer Andren months before his detention, the New York State Department of Correctional Services files clearly corroborated that citizenship status, and Watson provided his parents' contact information to further confirm it, ICE officers apparently did not feel they were obligated to pursue any leads before detaining Watson and subjecting him to removal proceedings. Instead, it became *Watson's* burden to demonstrate that *Matter of Hines* had only prospective application and therefore did not control in his case; it was *Watson's* burden to explain that derivative citizenship claims are governed by the law in effect when the last prerequisite to citizenship is satisfied and that he satisfied such conditions; and it was *Watson's* burden to persuade the IJ that because *Matter of Clahar* was the controlling law at the time his father became a naturalized U.S. citizen in 2002, Watson automatically became a derivative citizen under *Clahar* the same day his father obtained citizenship.

It is not surprising that Watson was initially unable to prevail in his legal case before the IJ, and not simply because Watson had only a partial high school education, no legal training, and limited access to legal resources in the library of the detention facility where he was held. *Watson I*, 133 F. Supp. 3d at 523. After June 4, 2008, Watson's citizenship claim rested on establishing that *Matter of Clahar* rather than *Matter of Hines* controlled the interplay between Jamaican legitimation law and U.S. derivative citizenship law, a difficult issue of law that Watson was particularly ill-equipped to assert on his own while in detention. Indeed, government lawyers, the IJ, and *even the BIA* all overlooked the BIA's clear rule of law when incorrectly concluding that *Matter of Hines* and not *Matter of Clahar* controlled Watson's derivative citizenship status. It was not until we ordered that counsel be appointed from the Court's Pro Bono Panel that the legal argument about the inapplicability of *Matter of Hines* — and the applicability of

*Matter of Clahar* — first emerged; unfortunately, Watson did not have the assistance of counsel until July 2010, over two years into his detention. Once armed with the assistance of pro bono counsel, Watson's legal argument as to his citizenship was quickly put forward: on May 17, 2011, we heard argument on his case, and a mere two weeks later, on May 31, 2011, we remanded to the BIA to, in part, clarify the confusion between the BIA's seemingly conflicting interpretations of legitimation under *Matter of Clahar* and *Matter of Hines*. *See Watson v. Holder*, 643 F.3d 367, 369 (2d Cir. 2011). Within months, ICE Chief Counsel sent a memorandum recognizing Watson's probable citizenship, Watson was released the next day, and shortly thereafter, ICE filed a supplemental brief with the BIA acknowledging that *Matter of Hines* applied only prospectively and therefore *Matter of Clahar*, and not *Hines*, controlled Watson's derivative citizenship claim. *Watson IV*, 179 F. Supp. 3d at 268–69.

Despite all this, the majority states that "Watson was certainly held pursuant to [legal] process by the time an immigration judge ordered Watson's removal, which occurred on November 13, 2008." Maj. Op. at 11. In the abstract, certainly, that is not an unreasonable view, but it seems to me that the concept of "legal process" loses much of its significance in circumstances where the government's profound errors caused the problems that adversely affected the detainee, and where the detainee had no assistance of counsel and yet bore the difficult burden of establishing a claim of citizenship or else face the possibility of deportation, notwithstanding what in retrospect was a valid claim of citizenship all along. Thus Watson's November 13, 2008, hearing came over six months into his detention in large part because the IJ had previously adjourned the proceedings on three different occasions so that Watson could attempt (in vain) to obtain pro bono assistance. *Watson IV*, 179 F. Supp. 3d at 265–66. Because Watson could not afford counsel and because he was unable to obtain pro bono counsel, he was ultimately forced to proceed pro se.

Watson's experience is far from unusual. Respondents are often forced into just such an unfortunate dilemma: either seek to postpone the removal hearing (and therefore extend their time in detention) in the hope of obtaining pro bono counsel, or else push forward without counsel and face a *far* greater likelihood of

receiving an order of deportability. A recent study of immigration proceedings found that 60% of individuals in detention were unable to obtain access to counsel before their cases were completed, and that number rose for individuals who were transferred from New York to far-off detention centers like the Tensas Parish Detention Center in Louisiana that held Watson, where such individuals went without representation 79% of the time. *See Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings New York Immigrant Representation Study Report: Part 1*, 33 Cardozo L. Rev. 357, 363 (2011). The "legal process" to which Watson was subjected, moreover, is one in which the odds are stacked against him and similarly situated respondents. The same study found that being detained *and* lacking representation "drops the success rate dramatically" for the respondent: only 3% of individuals who are detained and who go without counsel have successful outcomes, as compared to 74% of individuals who are represented and are either released or never detained – a nearly *2400%* increase in the odds of prevailing. *Id.* at 363–64. Watson, of course, fell into the former group until we ordered the appointment of pro bono counsel two years into his detention; once armed with counsel, those who are represented but detained have successful outcomes 18% of the time, a *500%* increase in odds over those similarly situated but without counsel. *Id.*

I raise these points to emphasize how much the assistance of counsel is central not only to the "legal process" of a criminal prosecution but also to immigration detention and removal proceedings. In the criminal context, "by the time a defendant is brought before a judicial officer, is informed of a formally lodged accusation, and has restrictions imposed on his liberty in aid of the prosecution, the State's relationship with the defendant has become solidly adversarial." *Rothgery*, 554 U.S. at 202. Given these considerations, it seems appropriate that the initiation of legal process coincides with the commencement of the right to the assistance of counsel. This is because, as the Supreme Court reflected in *Gideon v. Wainwright*, "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of

counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." 372 U.S. 335, 344–45 (1963) (quoting *Powell v. State of Ala.*, 287 U.S. 45, 68–69 (1932)). Yet these considerations are equally true of removal proceedings, and the need for adequate legal representation is particularly acute, not only because human beings stand to lose what Justice Brandeis described as "all that makes life worth living," *Ng Fung Ho*, 259 U.S. at 284, but also because there is a wide disparity in the success rate of those who have lawyers and those who proceed without counsel.

As the case at hand well demonstrates, adequate legal representation would serve not just the respondent, but also the government and the courts, which must adjudicate the difficult issues before them. Such representation is essential to the fair and efficient administration of justice. I believe the time has come to extend the right to counsel to immigration removal proceedings, and while I know that this is not the present state of the law, if there is any case where *meaningful* legal process cannot be said to have begun without the assistance of counsel, this, surely, is one.

## III.   Equitable Tolling

Because the majority concludes that Watson's false imprisonment claim accrued no later than November 13, 2008, and because that date was more than two years prior to the date Watson filed his administrative complaint, the majority holds that his cause of action was untimely. The majority then concludes that even after a bench trial, the district court abused its discretion in determining that Watson's specific circumstances warranted equitable tolling. Notwithstanding the open question as to when legal process can be said to have begun, I do not agree that the district court abused its discretion in deciding that equitable tolling was warranted. It is important to note that, to the best of my knowledge, our Circuit has only *once* reversed a district court that *granted* equitable tolling, and that unusual case concerned the tolling of a new cause of action added to an amended complaint on remand. *See Tho Dinh Tran v. Alphonse*

*Hotel Corp.*, 281 F.3d 23, 36–37 (2d Cir. 2002), *overruled by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).[3]

 Below, the district court concluded that even if Watson's FTCA claims were untimely, they should be equitably tolled until July 31, 2014 – the date Watson was first informed that he had the right to sue the government. Among the factors the district court identified as warranting equitable tolling were Watson's eleventh-grade education, his lack of legal training, the significant depression that set in as a result of his detention, his lack of awareness that he could bring an FTCA action against the United States until he was informed by his legal counsel around July 31, 2014, and — most important in my mind — the fact that the government repeatedly told Watson that he was not a citizen, a position adopted by the IJ, affirmed by the BIA, and sustained by the government until after Watson's release from detention in November 2011. *Watson I*, 133 F. Supp. 3d at 523.

 The Supreme Court has cautioned that in considering equitable tolling claims, courts of appeals must avoid a "standard [that] is too rigid," "emphasizing the need for flexibility, for avoiding mechanical rules." *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (internal quotation marks omitted). Accordingly, we have since recognized that "the exercise of a court's equity powers must be made on a case-by-case basis, mindful 'that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case,'" *Harper v. Ercole*, 648 F.3d 132, 136 (2d Cir. 2011) (quoting *Holland*, 560 U.S. at 649–50). "The 'flexibility' inherent in 'equitable procedure' is necessary 'to meet new situations [that] demand equitable intervention' . . . [where] specific circumstances, often hard to predict in advance, could warrant

---

[3] In *Tho Dinh Tran*, the district court equitably tolled an untimely RICO action added to plaintiff's amended complaint after a remand from our Circuit, under a doctrine permitting such tolling if a plaintiff established fraudulent concealment of a RICO violation. *Id*. at 36. We reversed the grant of equitable tolling because "[t]he plaintiff did not establish any of the elements of equitable tolling at trial and did not argue in its post-trial briefs that he had done so." *Id*. at 37.

special treatment in an appropriate case.'" *Dillon v. Conway*, 642 F.3d 358, 362 (2d Cir. 2011) (quoting *Holland*, 560 U.S. at 650).

In my view, the majority applies our precedents too mechanically, *contra Holland*, 560 U.S. at 650, rather than considering the "specific circumstances" Watson confronted in their totality. The majority concludes that equitable tolling cannot "be premised on Watson's lack of education, pro se status, or ignorance of the right to bring a claim," Maj. Op. at 14, but it bases this broad statement on just two prior cases in which courts found that *one of these factors alone*, given the particular circumstances of the case at hand, was insufficient to warrant equitable tolling. Thus, this Court has previously held that a plaintiff's *pro se* status *alone* did not constitute extraordinary circumstances, *see Smith v. McGinnis*, 208 F.3d 13, 18 (2d Cir. 2000) ("Smith's *pro se* status until March 1997 does not merit equitable tolling."), not that a lack of legal knowledge or access to legal resources can *never* be *a factor* in equitable tolling analysis. *Cf. Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (anticipating a probable grant of equitable tolling in a hypothetical case where "deprivation of a prisoner's access to his own legal materials and law library materials prevented a prisoner from" filing (emphasis omitted)). Similarly, the Supreme Court has observed that a party's own "mistaken reliance [of law]," when "not an obstacle beyond its control," *by itself* did not constitute an extraordinary circumstance, but explicitly left open whether a reasonable mistake of law could, in some circumstances, constitute the extraordinary circumstances justifying equitable tolling. *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 756 & n.3 (2016) ("[W]e need not decide whether a mistake of law, however reasonable, could ever be extraordinary."). The Supreme Court's decision in *Menominee Indian Tribe* certainly does not stand for the proposition that the *government's* persistent and clearly mistaken legal position taken at plaintiff's detriment can *never* be relevant to equitable tolling analysis.

The majority also summarily concludes that "Watson's depression cannot justify equitable tolling" because it "did not prevent him from contesting his citizenship before the immigration judge, so it could not have prevented him from filing his administrative claim for damages." Maj. Op. at 14. Yet we have

previously found that mental health issues *can* provide the basis to grant equitable tolling. *See Harper*, 648 F.3d at 137; *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010). The expert who assessed Watson and who testified at trial diagnosed Watson with adjustment disorder, "a mental disorder that is characterized by an intense emotional reaction to an identifiable stressor," in this case, brought on by Watson's ICE detention. App. 505–06. The expert identified "clinical symptoms of depression and anxiety," including "hopelessness and isolation," as Watson was cut off from his family and reported that he considered hanging himself while in detention. App. 506. The expert also testified that for individuals "incarcerated improperly, the psychological effect [of incarceration] is much greater; there's much more distress" because they know they are innocent and yet "ha[ve] to fight for their life." App. 507–08. Whether a physical or mental health condition "did in fact inhibit . . . or otherwise impair" one's ability to act such that it "might excuse the tardy filing" is a question of fact to be found by the trial court. *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002). Because I do not think Watson's ability to "contest[] his citizenship before the immigration judge," Maj. Op. at 14, *necessarily* means that Watson's depression could not have prevented him from pursuing additional, independent relief in the form of an FTCA action, I do not share the majority's view that the district court's factual finding was clearly erroneous.

Most critically, in my mind, is the fact that here, ICE officers, government lawyers, the IJ, and the BIA, all incorrectly and repeatedly asserted for nearly three and a half years that Watson did not satisfy the legal requirements for derivative citizenship and that his detention throughout was thus lawful. Such a circumstance is far from the "entirely common state of affairs" contemplated by *Wallace*. After *Matter of Hines* was decided on June 4, 2008, Watson was told by the government that his detention was lawful because of *Hines*'s supposed applicability to his case, and so Watson's potential false imprisonment claim rested on a question of law – *i.e.*, whether Jamaican legitimacy law as interpreted in *Matter of Hines* or in *Matter of Clahar* controlled his derivative U.S. citizenship claim. This question of law, of course, was not something Watson, a pro se litigant, could easily know on his own, especially in light of the government's repeated erroneous assertions that he had no legal claim to citizenship,

notwithstanding Watson's belief that he had possessed derivative citizenship since his father's naturalization in 2002. This is a distinct contrast from the typical criminal case, where the defendant knows whether he committed the actions purportedly justifying his arrest and therefore knows whether his detention is actually supported by probable cause. In those circumstances, such as the one contemplated in *Wallace*, the defendant knows that he did not take the actions alleged, and armed with the knowledge of the absence of probable cause, he may be confident that his imprisonment is false and that a potential tort claim should eventually have merit. As discussed above, until Watson had access to counsel, he had to confront alone the deeply flawed assertions of governmental authorities that he had no legal claim to citizenship. As a result, Watson was not able to articulate a legal basis for his claim of citizenship even for the purposes of preventing his removal, let alone to anticipate and assess the legal basis for a potentially meritorious false imprisonment suit. Given the "specific circumstances" of Watson's detention, I cannot conclude that the district court abused its discretion in concluding that this was an "appropriate case" warranting "special treatment." *Holland*, 560 U.S. at 650.

As to diligence, "the district court should consider all of the relevant facts and circumstances . . . to determine, utilizing its own discretion, whether the plaintiff . . . [was] sufficiently diligent." *Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 153 (2d Cir. 2013). The Supreme Court has cautioned that "[t]he diligence required for equitable tolling purposes is *reasonable diligence*, not maximum feasible diligence." *Holland*, 560 U.S. at 653 (emphasis added) (citation and internal quotation marks omitted). Below, the district court emphasized that Watson diligently attempted to establish his legal status as a U.S. citizen in his immigration proceedings, evinced by the fact that he "promptly and continuously asserted his citizenship, and took every action he knew of—or could reasonably be expected to know of—to demonstrate that he was a citizen," *Watson I*, 133 F. Supp. 3d at 523, all while ICE officers, government lawyers, the IJ, and even the BIA repeatedly asserted that as a matter of law Watson was not a citizen and should be deported. From the beginning, Watson had provided the correct information for his father to establish the link to his claim of derivative citizenship, and within two months of his detention had obtained and provided a

copy of his father's certificate of naturalization. Watson also filed an N-600 application for a certificate of citizenship, which was denied by USCIS on the basis of its wrongful reliance on *Matter of Hines*. Watson appealed this determination to USCIS's Administrative Appeals Office, which dismissed his appeal. Despite Watson's repeated insistence that he was a citizen, until November 2011 the government maintained that Watson was a removable alien, which was effectively ratified when the IJ concluded that Watson was an alien eligible for removal. Watson pursued his claim through multiple appeals to the BIA and the Second Circuit; eventually, the Second Circuit remanded his case to the BIA, at which point ICE released him shortly thereafter, without explanation, on November 2, 2011. Even at the time Watson was released, he was not yet told that the government now believed Watson had been a U.S. citizen all along; rather, he was only notified that the government had changed its position when ICE filed its supplemental brief with the BIA determining that *Matter of Hines* did not have retroactive effect. Watson also testified that there were few resources about the law available to him while he was in detention, and that he received no assistance from the guards or anyone else about his legal options. Finally, Watson was also diligent in filing his claim upon release. Watson was made aware in November 2011, shortly after his release, that his detention was unlawful when the government conceded that Watson had been a citizen all along. Watson filed his administrative tort claim within the two-year limitations window from the day his detention was terminated and he was released.

I do not believe the district court abused its discretion in finding that Watson had pursued his claims with "reasonable diligence," *Holland*, 560 U.S. at 653 (internal quotation marks omitted), given that Watson did everything possible to assert his citizenship in the face of colossal government failure resulting in his 1,273-day detention, and given that he had no assistance of counsel during the first two years of that detention and little access to legal resources throughout it. All the while, the government maintained that Watson was not a citizen as a matter of law and was therefore ineligible for relief. It is not clear to me how, under these circumstances, Watson should have known in 2008 that he needed to file an administrative tort claim to preserve a possible tort claim that could not possibly succeed until the government acknowledged his

ADD-37

Case 16-655, Document 149, 09/13/2017, 2123503, Page58 of 58
Case 16-655, Document 143, 07/31/2017, 2089430, Page18 of 18

derivative citizenship over three years later, let alone know that his false imprisonment claim would accrue a few months into his three-and-a-half year detention. Given that even *now* we are uncertain as to precisely how to determine when legal process begins and a false imprisonment claim accrues, *see* Maj. Op. at 11–12, it is difficult for me to think that Watson had adequate notice himself.

Given "all of the relevant facts and circumstances," *Phillips*, 723 F.3d at 153, I do not think the district court abused its discretion in finding that Watson both exhibited "reasonable diligence" and faced extraordinary circumstances warranting equitable tolling.

## IV.    Conclusion

I would hope that nothing about Watson's 1,273-day detention can be said to have been "an entirely common state of affairs." Maj. Op. at 14–15 (quoting *Wallace*, 549 U.S. at 396). If it were, we should all be deeply troubled. An American citizen was detained on the basis of a "grossly negligent" investigation that "led to [his] wrongful detention." *Watson II*, 2015 WL 7281637, at *1. The government, the IJ, and the BIA all misapplied clear precedents of law, which, coupled with Watson's lack of counsel until mid-2011, resulted in his three-and-a-half-year detention. Watson had an eleventh-grade education, suffered from depression as a result of his detention, and was repeatedly told by ICE officials, government lawyers, the IJ, and the BIA that he was not a U.S. citizen and that he would be removed from the country he had known as his home from the time he was 14 years old. Given all this, I cannot conclude that the "legal process" Watson experienced should extirpate his legal claims, nor can I draw the conclusion that the district court abused its discretion in determining that Watson's case merited equitable tolling. Although I join the majority's disposition of Watson's malicious prosecution and negligence claims, I cannot join the rest of the decision. I am hopeful that one day soon no immigrant *or* citizen will be forced to go through a predicament like Watson's without the assistance of counsel to help vindicate his cause.